UNITED STATES, Appellee

v.

Stephen E. BOONE, Jr., Specialist
U.S. Army, Appellant.

No. 94–0796.
CMR No. 9200231.

U.S. Court of Appeals for
the Armed Forces.

Argued March 9, 1995.

Decided Aug. 25, 1995.

For Appellant: *Richard T. McNeil* (argued); *Joseph B. Gilbert* and *Captain Blair Jacobs* (on brief); *Colonel Stephen D. Smith, Lieutenant Colonel James H. Weise, Major Robin L. Hall.*

For Appellee: *Captain J. Key Schoen* (argued); *Colonel John M. Smith, Major Lyle D. Jentzer, Captain Anthony P. Nicastro* (on brief).

*Opinion of the Court*

GIERKE, Judge:

1. A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of attempted rape and rape (2 specifications), in violation of Articles 80 and 120, Uniform Code of Military Justice, 10 USC §§ 880 and 920, respectively. The members sentenced appellant to a dishonorable discharge, confinement for 60 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the sentence but suspended confinement in excess of 50 years. The Court of Military Review * affirmed the findings and sentence. 39 MJ 541 (1994).

2. We granted review of two issues:

I

WHETHER THE LOWER COURT ERRED BY ADOPTING AN UNATTAINABLE STANDARD FOR APPELLANT TO ASSERT A CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL, AND THUS, HAS CHANGED THE LAW ENUNCIATED BY *STRICKLAND V. WASHINGTON* AND *UNITED STATES V. SCOTT.*

II

WHETHER THE LOWER COURT ERRED BY FINDING THAT SPECIALIST BOONE WAS NOT DENIED HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

3. We hold that the Court of Military Review did not adopt "an unattainable standard" for determining whether counsel were ineffective. Further, we hold that appellant was not denied his right to effective assistance of counsel on findings. We find it necessary, however, to remand the case for further factfinding on the effectiveness of defense counsel during the sentencing hearing and post-trial proceedings.

*Factual Background*

4. Appellant was accused of raping BC, a waitress and dancer at a night club near Fort Hood, Texas, on August 30, 1990. BC reported the incident to her boyfriend, who notified the local police. On September 26, 1990, appellant deployed to Saudi Arabia for Operation Desert Shield. He was interviewed in Saudi Arabia by a special agent of the Criminal Investigation Command (CID) on April 10, 1991. In a sworn written statement, appellant admitted having sexual intercourse with BC but maintained that it was consensual.

5. After appellant returned from Saudi Arabia to Fort Hood, he was accused of raping CM and attempting to rape TH on the night of September 1–2, 1991. CM testified that appellant had picked her up outside a club in Austin, Texas, and had raped her in his vehicle and then returned to the club. At the club one of CM's friends obtained appellant's license number and reported CM's complaint and the license number to the local police.

6. TH accused appellant of attempting to rape her in her apartment during the early morning hours of September 2. TH testified that appellant followed her home from the same club in Austin, Texas, where CM alleged that she had encountered appellant. TH filed a complaint with the local police in Round Rock, Texas. TH told the police that she had ripped an earring from appellant's ear, ripped a bead necklace from his neck, and possibly scratched his face. The police arrested appellant on the morning of Sep-

*See 41 MJ 213, 229 n.* (1994).

tember 2. Officer Ronald Potts testified that when he apprehended appellant, he observed scratches on his nose. He testified that appellant's "ear was agitated, swollen a little bit, but there was no sign of blood on his ear." Officer Potts found an earring and some multicolored beads in appellant's pocket.

7. Appellant was confined in the Round Rock city jail, where he was interviewed by civilian police Sergeant Dan Lemay at about 9:00 a.m. on September 2. Sergeant Lemay testified that he "asked him if he had a 'story' to tell" and appellant "said that he did." Sergeant Lemay described the interview as follows:

> I then took him to an interview interrogation room with a table and chair, and handed him this form and asked him to tell me his story. I then left the room.
>
> I returned about an hour later and went through the heading of the form, which includes his constitutional rights, with him. And then had him sign this form after he'd initialed those rights.

8. Upon examination by the military judge, Sergeant Lemay explained that he advised appellant of his rights after appellant had written out his "story." When asked by the military judge why he did not advise him of his rights beforehand, Sergeant Lemay answered, "I didn't know if he would tell me anything or not."

9. In his written statement to the Round Rock police, appellant said that TH invited him to her apartment. Appellant described his encounter with TH as follows:

> I followed her into the room. She sat on the bed. So we started kissing. She was moving her hands around my ears and neck. I backed up and, as I did that, my beeds [sic] somehow was rapped [sic] around her hand, and when I pulled back, they popped. I got mad and pushed her away. When I turned my back she jumped up and grabbed me from behind digging her nails into my skin. I just pushed her off and headed for the door. She was like no, cause she though[t] her boyfriend was out there. But I did not

care and she knew that. So I walked off. . . .

(Pros Ex 5)

10. Appellant was not interviewed about the incident with CM. His statements to the CID and the Round Rock police were received in evidence without defense objection or a motion to suppress.

11. At the Article 32, UCMJ, 10 USC § 832, investigation, appellant was represented by Captain (CPT) Neeves, his detailed military defense counsel. After the Article 32 investigation but before trial, appellant retained Mr. Joe Woodward to represent him. Mr. Woodward's fees were paid in two installments by appellant's uncle, Air Force Major Archie Roundtree. (Def App Ex E follows CMR decision in Vol. I)

12. The general court-martial convened on December 30, 1991. Appellant was represented by Mr. Woodward as well as CPT Neeves. Mr. Woodward requested and received a 1-month continuance, representing that he had been hired the week before and was not prepared for trial. Appellant consented to this delay. The military judge ordered that the defense provide trial counsel notice of motions, forum, and pleas not later than January 21, 1992.

13. The court-martial reconvened on January 30, 1992, before a different military judge. Mr. Woodward made several motions, including a motion to sever the charges that had not been included in the notice required by the military judge's order. When the military judge inquired why Mr. Woodward had not complied with the notice requirement, Mr. Woodward did not answer directly, but stated:

> There are various reasons but it suffices to say that I normally don't read through the government documents in the case, but, as I was going through those documents yesterday, in final preparation for the trial, I found two cases—two letters. One in particular that appeared—which I'd like to have as the next appellate exhibit. . . .

14. Mr. Woodward then presented correspondence from a Fort Hood official to local authorities requesting release of jurisdiction. The military judge returned the discussion to

the question of notice and again asked why Mr. Woodward had not complied with the notice requirement. Mr. Woodward responded:

I didn't raise the motion as I did very little work on this case because I hadn't been paid as had been promised to me. And, in fact, I haven't been paid today and shouldn't be here today or should be here asking to be relieved, but I'm not. I'm in the private practice of law, I get paid for the work I do and when I don't get paid, I don't get wor—I don't do work.

\* \* \*

I'm prepared to go to cas—to trial on this case, I have gone over this very thoroughly and I'm prepared to go to trial. I'm telling you that I was not prepared to spend another three hours in court arguing a motion when I hadn't been paid to do that. Now, if that's not a sufficient basis for you, that's all right, the motion is there.

15. The military judge advised him, "[O]nce you show up and say you're on the case, you're the counsel, and you have to prepare regardless of whether or not you get paid." Mr. Woodward responded, "I understand that, and I am prepared."

16. The motion to sever the charges ultimately was considered and denied. Thereafter, appellant pleaded not guilty to all Charges and specifications.

17. The defense theory on the merits was to attack the credibility of the three victims. Appellant testified consistently with his pretrial statements. He maintained that his sexual encounters with BC and TH had been mutual and consensual. He denied meeting CM at the club. He testified, "I don't even know who she is, sir."

18. The court-martial convicted appellant of all Charges and specifications. During the sentencing hearing, the prosecution presented appellant's personnel qualification records but no aggravation evidence. (Pros Ex 14 and 15)

19. The defense case on sentencing consisted solely of appellant's oral unsworn statement made by counsel, consisting of the following:

I, Specialist Boone, want to explain to the court members some of the things about me, individually, and some of the experiences in my life, in an attempt to help you in understanding these offenses more so than the evidence that you've heard so far.

I'm 23 years old. I grew up in a broken home, my parents were divorced when I was 7 years old, I've had very little contact with my father since that time. I grew up, and have two younger brothers—a younger brother and a younger sister, who is younger. My brother is 21 years old and is fixing to go to college, and my sister is 19 years old and expected to be married.

I cannot claim to you that any of my problems come from my cultural background, because I was raised in a good family. I always had a nice home and parental guidance from my mother. Although, I feel that I sorely miss parental guidance that my father could've given me during my early youth.

All during my days in high school, and since that time, I have associated with women, girls, when younger, and women since then. I have never had any problem with any women up until this particular incident. I've been to the clubs in and around Killeen, particularly to the Club XS in Austin, on many occasions. And on many of those occasions I met and had further associations with women, who where [sic] there, danced with me and later I went home with.

I cannot argue with your interpretation of the facts as you see them, and I don't intend to criticize the judgment as you have entered. I can only tell you that my perceptions, at the time, perhaps wasn't sensitive enough to the feelings or desires of other people. I have learned a hard lesson in this case. And I've been in jail for 157 days, and although that may not seem like much for the offenses of which you have convicted me, I fully understand and appreciate the seriousness of the acts that I've done. And I can assure you that I've learned a hard lesson from these facts, and that no such incidents will ever occur in the future.

I am not a violent person. I've never hurt anyone nor did intend [sic] to hurt any of the women that were associated with this case. I believe that I could now recognize more about the way that they, women, other people in particular, act in the future. I am truly sorry if I have caused anybody any harm, any hard feelings, or if in any way I hurt these ladies, either now or any time in the future, and I offer my sincerest apologies to them.

I wish to get on with my life at the earliest possible moment. I have lost at this point, basically everything. I have been in jail, as I said, for 157 days. I'm well past my normal ETS and I have not been paid in any form or fashion since the day of my incarceration. I can only ask you to try to understand the situation that I was in and not treat me overly harsh for these things. Although as I've previously said, I recognize the severe nature of the charges which I've now been convicted of. I have never been in any trouble, either in civilian or military life up until this time. I ask you to take my prior record, and my prior history and background, into consideration, when you go to determine what you believe is an appropriate sentence in this case. Thank you.

20. No witnesses from appellant's family, his chain of command, or from among his fellow soldiers were called.

21. The maximum punishment in this case was a dishonorable discharge, confinement for life, total forfeitures, and reduction to the lowest enlisted grade. After 23 minutes of deliberations, the court-martial sentenced appellant to a dishonorable discharge, confinement for 60 years, total forfeitures, and reduction to the lowest enlisted grade.

22. At the end of the trial the military judge asked who would "handle the post-trial matters," and Mr. Woodward responded, "I will." Mr. Woodward submitted a one-page response to the staff judge advocate's recommendation, raising issues of lack of jurisdiction, the military judge's denial of the motion to sever, sufficiency of the evidence, and sentence appropriateness. At some point after the trial appellant discharged Mr. Wood-

ward and filed a formal complaint against him with the State Bar of Texas. The State Bar of Texas issued a public reprimand to Mr. Woodward for "neglecting a legal matter entrusted to him." 39 MJ at 542.

23. Former-CPT Neeves, who had since left active duty but agreed to remain on the case pro bono, submitted clemency materials to the convening authority. In his post-trial submission, Mr. Neeves also asserted that Mr. Woodward had provided ineffective representation at trial.

24. Before the Court of Military Review, appellant asserted that he had been denied his Sixth Amendment right to effective assistance of counsel. Under the Army court's procedures enunciated in *United States v. Burdine*, 29 MJ 834 (ACMR 1989), Mr. Neeves provided an affidavit in response to a request by government appellate counsel. He stated that his preparation of the case involved interviews with 12 potential witnesses, including the three alleged victims, as well as Specialist Horn and Specialist Dunston (who testified for the prosecution), and Specialist Johnson (who testified for the defense). He also interviewed or caused to be interviewed two field grade officers and four noncommissioned officers whose relationship to the case is not reflected in the record. After appellant retained Mr. Woodward, then CPT Neeves photocopied his entire case file and turned it over to Mr. Woodward. Thereafter, he deferred to Mr. Woodward as lead counsel and provided support only as requested. (Govt App Ex 1)

25. Mr. Woodward did not respond to government appellate counsel's request for an affidavit. The Court of Military Review considered a letter from Mr. Woodward to the State Bar of Texas, responding to appellant's complaints. 39 MJ at 543. In that letter Mr. Woodward recites that he prepared appellant's case as follows:

(1) He read the allied papers and report of Article 32 investigation.

(2) He initiated inquiries of the local police to determine if any of the alleged victims had a criminal record and received a negative response.

(3) He conferred with CPT Neeves "on 2 or 3 occasions" regarding potential defense evidence and "requested that he interview several witnesses and report their responses."

(4) He personally visited the clubs in Austin and Killeen where the incidents allegedly arose, "observed the general climate within each club in a [sic] effort to determine if they were 'pick-up' establishments," made inquiries about the alleged victims and received no derogatory information.

(5) He discussed appellant's version of the facts with appellant "[o]n at least three separate occasions."

(6) He discussed with appellant the possibility of a negotiated plea and determined that appellant "remained adamant about pleading not guilty to all charged offenses."

(7) He spent about 12 hours researching the law regarding military jurisdiction and grounds for severance.

(Encl 2 to Def App Ex A—Vol. I of Record)

26. After examining the record of trial, the affidavit of Mr. Neeves, and Mr. Woodward's letter, the Court of Military Review concluded that "appellant has failed to show that his defense team provided ineffective assistance of counsel." 39 MJ at 543.

### Discussion

■ 27. Defense counsel are presumed to be competent. To overcome the presumption of competence, an appellant must show (1) that his "counsel's performance was deficient"; and (2) "that the deficient performance prejudiced the defense" so "as to deprive [appellant] of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *United States v. Scott*, 24 MJ 186, 188 (CMA 1987). Where an accused is represented by both civilian counsel and detailed military counsel, the performance of defense counsel is measured by the combined efforts of the defense team as a whole. *United States v. Walker*, 21 USCMA 376, 380, 45 CMR 150, 154 (1972).

■ 28. A client's "assertion that his counsel were ineffective waives the attorney-client privilege 'as to matters reasonably related to that' assertion." *United States v. Lewis*, 42 MJ 1, 5 (1995), *citing United States v. Dupas*, 14 MJ 28, 30 (CMA 1982). While defense counsel may choose to respond to an allegation of ineffectiveness, "defense counsel should not be compelled to justify their actions until a court of competent jurisdiction reviews the allegation of ineffectiveness and the government response, examines the record, and determines that the allegation and the record contain evidence which, if unrebutted, would overcome the presumption of competence." *United States v. Lewis*, 42 MJ at 6.

■ 29. In Issue I, appellant asserts that the Court of Military Review "improperly narrowed the standard enunciated" in *Strickland* and the decisions of this Court applying *Strickland*. Final Brief at 4. The Government argues that the court below correctly applied the *Strickland* standard and that appellant's quarrel is merely with that court's application of the standard to the facts of this case. We agree with the Government based on our review of the decision of the court below. We are satisfied that it correctly articulated and applied the *Strickland* standard.

30. In Issue II, appellant asserts that the court below erred by rejecting his claim that he was denied his right to effective assistance of counsel. We have examined each of appellant's allegations regarding Mr. Woodward. For the most part, we agree with the rationale and decision of the court below, and we will not repeat it here.

■ 31. We differ, however, concerning the sentencing hearing. We find no explanation and can discern no tactical reason from the record for the meager defense presentation. Appellant has furnished affidavits indicating that his mother and his uncle, an Air Force career officer, were willing to attest to his family background and good character. (Def App Exhibits F and G) Appellant apparently had served honorably in Germany and Saudi Arabia, and no disciplinary actions were reflected in his personnel records. CPT Neeves interviewed two field-grade offi-

cers and several noncommissioned officers who apparently were not witnesses on the merits. Yet no one from appellant's chain of command or from among his fellow soldiers was called to testify to his personal qualities or soldierly performance. The lack of defense evidence was specifically cited in the staff judge advocate's recommendation to the convening authority regarding sentence appropriateness. (Addendum to recommendation dated September 1, 1992, at 9—Vol. II of Record)

32. Mr. Woodward's extensive letter to the State Bar of Texas makes no mention of the trial strategy during the sentencing hearing. Likewise, Mr. Neeves' affidavit does not address the defense team's tactics on sentencing. We hold that the insufficiency of the record calls for explanation from the defense team. *See United States v. Lewis,* 42 MJ at 6. A remand for further factfinding on why such a meager sentencing case was presented is required.

*Decision*

The decision of the United States Army Court of Military Review as to the sentence is set aside. The record of trial is returned to the Judge Advocate General of the Army for remand to the Court of Criminal Appeals for further factfinding regarding the defense trial tactics on sentencing. If the factual issues cannot be resolved by affidavits, a hearing under *United States v. DuBay,* 17 USCMA 147, 37 CMR 411 (1967), may be ordered. Thereafter, the Court of Criminal Appeals will reconsider its decision on the issue of ineffectiveness of counsel for sentencing on the basis of that record. In the event that further factfinding is impracticable, a rehearing on sentence may be ordered.

Thereafter, Article 67(a), UCMJ, 10 USC § 867(a) (1989), shall apply.

Judges COX, CRAWFORD, and WISS concur.

SULLIVAN, Chief Judge (dissenting):

31. Like the majority, I am disturbed by the sentencing process and the sentence. However, in my view, as a matter of law, the Court of Military Review had adequately addressed the issue of effective assistance of counsel, and I adopt its decision, *see* 39 MJ 541 (1994).

32. There is a final point to be addressed on the sentence. This point is not from the accused's viewpoint but from that of the military community that produced the military jury that sentenced the accused. I call it "truth in sentencing." *See* Knapp, *Allocation of Discretion and Accountability within Sentencing Structures,* 64 U.Colo.L.Rev. 679, 685 (1993).

33. The jury sentenced him to 60 years. Already, the convening authority has reduced it to 50. The outcome of the majority's decision in this case may reduce it further. The parole authorities probably will reduce the ultimate sentence even more. Nobody tells the members this. The judge—learned in the law and its operation—knows that an accused rarely serves the full time of sentence, but the jury is uneducated on this point. Perhaps it is time to have "truth in sentencing." *E.g.,* Denniston, *Pro Viewpoint–Getting Tough on Crime: Does It Work?* 38 April Boston Bar Journal 9, 26 (1994), *citing* Chapter 432 of the Acts of 1993 (Mass.)-Truth in Sentencing Law. Congress should address this issue since this Court does not have the power to make a law mandating this fundamental point.