**UNITED STATES**

v.

**Major Robert R. GILLESPIE, 242–78–4596, United States Air Force.**

**ACM 32466.**

U.S. Air Force Court of Criminal Appeals.

Sentenced Adjudged 22 March 1996.

Decided 22 Dec. 1997.

Appellate Counsel for Appellant: Robert Estrada, Colonel Douglas H. Kohrt, Lieutenant Colonel Kim L. Sheffield, and Major Ray T. Blank.

Appellate Counsel for the United States: Colonel Brenda J. Hollis, Lieutenant Colonel Michael J. Breslin, and Captain Martin J. Hindel.

Before SNYDER, GAMBOA, and SENANDER, Appellate Military Judges.

## OPINION OF THE COURT

SNYDER, Senior Judge.

Tried by general court-martial, appellant was convicted, contrary to his pleas, of battery, two specifications of communicating a threat, and disorderly conduct. Articles 128 and 134, UCMJ, 10 U.S.C. §§ 928 and 934 (1994). He was found not guilty of carrying concealed weapons. He was sentenced to a dismissal, confinement for one year and six months, and forfeiture of all pay and allow-

ances. The convening authority approved the sentence as adjudged. Appellant submits five assignments of error for this Court's consideration. We grant partial relief and affirm.

## I. FACTS

The offenses for which appellant was convicted occurred at Padre Island National Seashore, Corpus Christi, Texas (TX), where he and his wife, Meria Gillespie, camped between on or about 4 July 1995 and on or about 11 July 1995. The crux of appellant's misconduct during this period was the constant abusive treatment of Meria Gillespie, which began from the moment of their arrival, the afternoon of 4 July 1995, at the camp site for their recreational motor home (RV). Ms. Gajdos, whose family occupied the site next to appellant, testified to observing appellant and his wife arrive and park, using walkie-talkies as Meria Gillespie served as spotter while appellant backed the RV into their assigned site. Upon parking and exiting the RV, appellant immediately began berating and directing profanity towards Meria Gillespie in a loud, degrading, and angry voice for approximately five to six minutes, until she walked away.

Padre Island has posted "quiet hours" between 2200 and 0600. Ms. Gajdos testified that appellant's generator kept her awake the entire evening of 4 July 1995. When appellant operated his generator again the following evening of 5 July 1995, Ms. Gajdos called the park ranger between 2300 and 2400 and reported appellant's loud generator and the disturbance it was causing. Ranger Morris, a National Park Policeman, responded to appellant's RV, in uniform, and knocked several times. Ranger Morris testified that because he anticipated encountering an elderly person, for that is the norm at the park, he initially was not concerned with the amount of time required to receive a response to his knocking. When he observed the lock on the door being manipulated, however, he considered it suspicious and assumed more of a defensive posture. He was standing on the ground looking up at the entrance to the RV.

When appellant opened the door, Ranger Morris illuminated the RV door with his flashlight and immediately identified himself. Appellant's face was all that was visible to him. Appellant's first words to Ranger Morris were, "Get that flashlight out of my face," and then he demanded, "Who the hell are you? ... What do you want? ... It's very late, why are you bothering me? ... Who are you? ... Get away from me." Appellant repeated his demand to get the flashlight out of his face. Ranger Morris testified that appellant was furious and screaming at the top of his voice. Ranger Morris also testified that, because he was alone, with no backup and no dispatcher, he wanted appellant out of the RV where he couldn't grab anything. He had left the headlights of his vehicle on and was using the flashlight to see and so appellant could see he was "legitimate authority."

Appellant eventually exited the RV by throwing open the door and he raced towards Ranger Morris shouting and screaming "at the top of his lungs," as follows:

Do you know who I am? I am a United States Air Force major, an active duty major. Who are you to bother me? Why are you here? Who the hell are you? Why are you doing this to me? Get that flashlight out of my face, I am trying to sleep. You have no right to do this to me. I paid my camp fees.

Ranger Morris testified that the above was interspersed with profanity, and he described these verbal bursts of appellant as "one sentence blurbs ... just kind of incoherent angry things he was yelling at me." Ranger Morris states he had to use a loud command voice to get appellant to respond to his directions, including telling appellant to shut up. Appellant "was furious. His face was red, he was screaming, gesturing very violently with his hands up in the air." Ranger Morris testified he became slightly concerned for his personal safety. We might add that the above is only a small sampling of appellant's tirade towards Ranger Morris.

The matter ended with Ranger Morris issuing appellant a citation for disorderly conduct; specifically, disturbing noise from the generator. Ranger Morris clearly stated he did not cite appellant for his loud and abusive behavior. Ranger Morris stated that by the

time the confrontation with appellant was over, a crowd of 20 to 30 campers was outside their individual camp sites. Appellant also falsely represented himself as a prisoner of war (POW) of the Vietnam Conflict and informed Ranger Morris that he had not been treated so rudely since being a POW.

Ms. Gajdos was awakened at 0600 the next morning by appellant's banging on his generator, loud profanity, and throwing tools on the pavement. Appellant was very loud and angry for approximately 15 minutes, and he awakened all of his neighbors. Appellant was "very, very angry and very out of control." An hour later, appellant and Meria Gillespie were breaking camp to move to another site where the dunes would muffle the noise level of his generator. Appellant, who is a licensed ham radio operator, was removing a 25-foot tall radio antenna from his RV. Ms. Gajdos observed that Meria Gillespie appeared angry, as she was sitting at a picnic table with her back to appellant. Ms. Gajdos described appellant as screaming irrationally and trembling, "I need help," "help me." She added that this conduct continued for approximately 10 minutes, and that appellant was so erratic, scary, and out of control, that she became frightened for her children.

Ms. Gajdos testified that, considering the size of the antenna pole (approximately two inches in diameter), appellant's size, and the difficulty of what he was doing, appellant—in her opinion—was in control of the antenna at all times. As a result of what she was observing, Ms. Gajdos testified that she commented to her husband that appellant "was going to hit her [Meria Gillespie] in the head with that antenna." She then observed appellant allow the antenna to fall and strike his wife on the back of her head without ever letting go of the pole. After striking Meria Gillespie with the pole, appellant stated to her, "I told you I needed help."

## II. ACCOMPLICE INSTRUCTION

We first address appellant's averment that the military judge erred by giving an accomplice instruction regarding Meria Gillespie's testimony. We disagree. The instruction was given erroneous, but we find no prejudice.

Meria Gillespie testified that the assault never happened. The pole fell but it did not strike her. Further, she testified consistently with appellant that he never made a threat to kill Ranger Morris, and that appellant showed Ms. Schmidt his weapons to obtain her advice, as a park hostess, on whether his storage of the weapons in their RV complied with the park's regulations.

During an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (1994), session outside the presence of the members to review proposed instructions on findings, the military judge advised *sua sponte* that she intended to give an accomplice instruction on the testimony of Meria Gillespie. Civilian defense counsel objected on the bases that it is improper to give the instruction on a defense witness' testimony, citing *United States v. Davis*, 32 M.J. 166 (C.M.A.1991) and *United States v. McCue*, 3 M.J. 509 (A.F.C.M.R.1977), and that it would unduly prejudice the defense. The military judge overruled the objection and gave the standard instruction on accomplice testimony. We first address whether the military judge erred in giving the instruction over a defense objection, then we will address the sufficiency of the instruction given.

The standard of review for whether the military judge erred in giving or not giving an instruction *sua sponte* is abuse of discretion. *United States v. Damatta–Olivera*, 37 M.J. 474, 478 (C.M.A.1993). A witness is deemed to be an accomplice when there is evidence which indicates the witness was culpably involved in the crime with which the accused is charged. *United States v. Scoles*, 33 C.M.R. 226, 1963 WL 4842 (C.M.A.1963). This test is satisfied whenever the witness is subject to prosecution for the offense for which the accused is charged. *United States v. Garcia*, 46 C.M.R. 8, 1972 WL 14381 (C.M.A.1972); *McCue*, 3 M.J. at 513. The law historically has taken a skeptical view towards accomplice testimony because of the perceived self-interest which an accomplice may have in the case's outcome. *Scoles*, 33 C.M.R. at 231; *accord United States v. Gillette*, 35 M.J. 468 (C.M.A.1992) and cases cited therein. Whether a particular witness is an accomplice is a matter for

the court members to determine under proper instruction. *Gillette*, 35 M.J. at 470.

The military judge was correct in her determination that the cases cited to her by civilian defense counsel either were not dispositive or not supportive of his position. In *Davis*, the issue of giving an accomplice instruction on a defense witness was not before the Court because there was no objection at trial. In dicta, however, the Court did recognize the fact that some courts discourage the instruction for defense witnesses, but also cited state and federal cases where giving the instruction was allowed. *Davis*, 32 M.J. at 167. Applying a plain error standard of review, *see United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *United States v. Causey*, 37 M.J. 308, 311 (C.M.A.1993); *United States v. Fisher*, 21 M.J. 327, 328 (C.M.A.1986), the Court concluded it was obvious to all that the witness was an accomplice and giving the instruction was not prejudicial to the accused's substantive rights. *Davis*, 32 M.J. at 168.

■ *McCue* is completely opposite to appellant's position. In *McCue*, this Court held that the accomplice instruction may be given as to an accomplice who testifies for the defense as well as for the prosecution. *McCue*, 3 M.J. at 511 (citing *United States v. Nolte*, 440 F.2d 1124 (5th Cir.), *cert. denied*, 404 U.S. 862, 92 S.Ct. 49, 30 L.Ed.2d 106 (1971)). Except for its holding that giving the accomplice instruction "is within the military judge's sound discretion," *McCue* is still a binding precedent. The current state of the law on the accomplice instruction requires a two-pronged test: first, the evidence must raise a reasonable inference that a witness may have been an accomplice to the crime with which the accused is charged; *and*, second, the instruction must be requested by either the prosecution or the defense. When both prongs are met, the military judge *must* give the instruction. *Gillette*, 35 M.J. at 470. Further, the military judge has a *sua sponte* duty to give the instruction only when an accomplice's testimony is the sole evidence on an element of an offense and the testimony is significantly impeached. *United States v. Lee*, 6 M.J. 96, 97 (C.M.A.1978);

*United States v. Sanders*, 34 M.J. 1086, 1092 (A.F.C.M.R.1992).

■ As *Gillette* provides that either party may request the accomplice instruction, obviously there is no prohibition regarding giving the accomplice instruction on a defense witness' testimony where appropriate, and we so hold. *United States v. Urdiales*, 523 F.2d 1245, 1248 (5th Cir.1975), *cert. denied*, 426 U.S. 920, 96 S.Ct. 2625, 49 L.Ed.2d 373 (1976); *Nolte*, 440 F.2d at 1126; *United States v. Morrone*, 502 F.Supp. 983, 992 (E.D.Pa.1980), *aff'd*, 672 F.2d 905 (3d Cir. 1981), *cert. denied*, 455 U.S. 941, 102 S.Ct. 1433, 71 L.Ed.2d 652 (1982). Although an accomplice witness for the defense may not have the same self-interest as a prosecution accomplice witness, *e.g.*, expectation of leniency, etc., there still are valid reasons for skepticism. For example, a defense accomplice witness may be willing to claim culpability for the charged offense because he/she is no longer amenable to prosecution. *See United States v. Hartman*, 627 F.2d 7, 8–9 (6th Cir.1980); *United States v. Stulga*, 584 F.2d 142 (6th Cir.1978). This was the case with Meria Gillespie. By the time of appellant's trial, she had resigned her commission and was discharged from the Air Force.

In the instant case, neither the prosecution nor the defense requested the instruction. While the prosecution argued against sustaining civilian defense counsel's objection to the instruction, trial counsel did not request it in the first instance. It was included in the package of instructions which the military judge informed counsel she intended to provide the members. This, however, is *not* the determinative factor. Although *Gillette* requires the military judge to give the instruction when the two prongs are satisfied, there is nothing in *Gillette* which precludes the military judge from doing so when he/she deems the interest of justice requires it. *See United States v. Graves*, 1 M.J. 50, 53 (C.M.A.1975). Nonetheless, the military judge is required to give a correct instruction, especially when done in the face of a timely objection. In the instant case, the military judge gave an erroneous instruction.

While hearing trial defense counsel's objection, the military judge advised that her con-

cern was the fact that Meria Gillespie's testimony "was in fact, adverse to the accused as well as in favor of the accused as to the assault consummated by a battery ... while she has been in some ways exculpatory, she has in some ways also been adverse to the interests of the accused in her testimony." The military judge primarily was concerned with the concealed weapons charge and Meria Gillespie's status as a joint occupant of the RV, wherein the weapons were kept by appellant.

During instructions, the military judge instructed the members as follows:

> You are advised that a witness is an accomplice if she was criminally involved in an offense with which the accused is charged. The purpose of this advice is to call to your attention a factor specifically affecting the witness' believability, that is, a motive to falsify her testimony in whole or in part, because of an obvious self-interest under the circumstances. The testimony of an accomplice, even though it may be apparently credible, is of questionable integrity and should be considered by you with great caution. In deciding the believability of Meria Gillespie, you should consider evidence including but not limited to the testimony that she and the accused jointly occupied the motor home in which Connie Schmidt testified the pistol and [shotgun] were located and engaged in conversations in which obscenities were exchanged in public with her husband. Whether or not Meria Gillespie, who testified as a witness in this case, was an accomplice, is a question for you to decide. If Meria Gillespie shared the criminal intent or purpose of the accused, if any, or aided, encouraged, or in any other way criminally associated or involved herself with the offense with which the accused is charged, she would be an accomplice whose testimony must be considered with great caution.

This instruction is the standard instruction found in Department of Army Pamphlet 27–9, *Military Judges Benchbook*, May 1982, ¶ 7–10, and that is what renders it erroneous. It was not tailored to the situation for which it was given.

When giving the accomplice instruction as regards a defense witness, the military judge must be careful to tailor the instruction so as not to subtly shift the burden of proof from the prosecution to the defense. *United States v. Rosa,* 560 F.2d 149, 156 (3d Cir.), *cert. denied sub nom. Sica v. United States,* 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 135 (1977). *See also Cool v. United States,* 409 U.S. 100, 93 S.Ct. 354, 34 L.Ed.2d 335 (1972). This is especially so in instances where an accomplice's testimony is both favorable and adverse to the accused, as the military judge perceived the situation in the instant case. The balance which the military judge must strike is adequately instructing the court members so they do not automatically reject the witness' exculpatory testimony merely because they might deem his/her adverse testimony too suspect to accept. *United States v. Stulga,* 584 F.2d 142, 144 (6th Cir.1978).

We note that the current Instruction Benchbook, Department of Army Pamphlet 27–9, *Military Judges Benchbook,* 30 September 1996, ¶ 7–10, still contains only the standard instruction for accomplice testimony adverse to the accused. We commend the last paragraph of the instruction in *Stulga* as a model for military judges to use in conjunction with the standard instruction when accomplice testimony is both favorable and adverse to the accused. It reads as follows:

> I further charge you that, to the extent, if any, that you find the testimony of an accomplice tends to support the contention of the [accused], that is, tends to show the [accused] to be not guilty, you may consider such testimony in that respect and weigh such testimony, along with the other evidence in the case, under the rules given you in this charge, and you may find the [accused] not guilty based on an accomplice's testimony.

*Stulga,* 584 F.2d at 144.

Had the military judge in the instant case tailored the standard accomplice instruction to include language similar to the *Stulga* language, the instructions then would truly have addressed the situation of an accomplice providing testimony both adverse and favor-

able to appellant. Unfortunately, the instruction as given did not fully explain how the members should have assessed Meria Gillespie's favorable testimony.

■ Although the instruction was erroneous, we find it did not prejudice the substantive rights of appellant. First, it was an evidentiary instruction which went solely to credibility as opposed to an instruction on the elements. *United States v. McKinnie,* 32 M.J. 141, 144 (C.M.A.1991). Second, even without the accomplice instruction, the members still would have received an instruction on credibility of witnesses, which instructs the members to consider each witness' interest, if any, in the outcome of the trial. *See United States v. Rehberg,* 15 M.J. 691 (A.F.C.M.R.1983). Given these factors, we are convinced that the instruction did not deprive appellant of Meria Gillespie's exculpatory testimony, for, as we discuss, *infra,* we are convinced that the evidence of appellant's guilt is so compelling that the incomplete accomplice instruction had no impact on the court members concluding Meria Gillespie was not a credible witness. Her evasiveness while answering trial counsel's questions and the other evidence of record provided the members more than an adequate basis on which to reject her testimony on findings.

### III. COMMUNICATING A THREAT

Although appellant does not assign any error, other than factual sufficiency regarding Specification 2, Charge II, our statutory review mandate, Article 66(c), UCMJ, 10 U.S.C. § 866(c) (1994), constrains us to address the sufficiency of the instruction provided the members on this specification. The pertinent portion of Specification 2, Charge II, alleges as follows:

> [W]rongfully communicate to James Bret Morris, a threat, to wit: I know a lot of very important people and know how to work the system by writing letters to my very powerful friends and I'm going to get you in lots of trouble, or words to that effect.

Appellant testified that, although he was treated discourteously without good cause by Ranger Morris, he did not utter the charged language. Meria Gillespie testified it was

she who made the statement regarding writing a letter of complaint addressing Ranger Morris' alleged abusive behavior towards them.

■ A wrongful threat in violation of Article 134 may be directed at either a person's physical safety, property, or reputation, and must express an avowed determination or intent to injure or do harm. MANUAL FOR COURTS-MARTIAL, UNITED STATES, Part IV, ¶ 110 (1995 ed.); *United States v. Frayer,* 29 C.M.R. 416, 1960 WL 4526 (C.M.A.1960); *United States v. Jenkins,* 26 C.M.R. 161, 1958 WL 3327 (C.M.A.1958). Further, it is not the accused's actual intent which is the gravamen of the charge but the intent expressed in the language charged which governs. *United States v. Greig,* 44 M.J. 356 (1996). Even where words or language is clearly threatening, the surrounding circumstances must be assessed to determine wrongfulness. *United States v. Cotton,* 40 M.J. 93 (C.M.A.1994); *United States v. Murray,* 43 M.J. 507 (A.F.Ct.Crim.App.1995).

The first facet of the specification which gives us pause for concern is that the allegedly threatening language is problematic, *i.e.,* it may very well address an intent to do a lawful act in a lawful manner as well as an unlawful act. There is no indication in the record that the defense sought a bill of particulars from the prosecution, but the arguments of trial counsel appear to have evinced a theory that appellant's threat was in actuality to make a false complaint against Ranger Morris. If so, it concerns us that the specification does not allege this fact. In the absence of a request for particulars, however, we restrict our consideration to the adequacy of the military judge's instructions.

■ There was no objection to the instruction given by the military judge or request for additional instructions. Nonetheless, the waiver doctrine does not apply to instructions on the elements of offenses, as the military judge has a *sua sponte* duty to provide the members complete and correct instructions. *United States v. Westmoreland,* 31 M.J. 160, 163–64 (C.M.A.1990), *cert. denied,* 498 U.S. 1088, 111 S.Ct. 966, 112 L.Ed.2d 1053 (1991); *United States v.*

*Mance,* 26 M.J. 244, 256 (C.M.A.), *cert. denied,* 488 U.S. 942, 109 S.Ct. 367, 102 L.Ed.2d 356 (1988); *Murray,* 43 M.J. at 512. The pertinent portion of the military judge's instructions to the members on this specification are as follows:

> In order to find the accused guilty of this offense, you must be convinced by legal and competent evidence beyond a reasonable doubt of the following elements: First, ... the accused communicated certain language [to James Bret Morris], to wit: "I know a very lot of important people and know how to work the system by writing letters to my powerful friends, and I am going to get you in lots of trouble." *...[T]hird, that the language used by the accused under the circumstances amounted to a threat. That is, a clear, present, determination or intent to injure the reputation of the said James Bret Morris presently or in the future; fourth, that the communication was wrongful;* and fifth, that under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. Proof that the accused actually intended harm to another is not required, however, the language on its face must convey an intention to injure another immediately or in the future.

(Emphasis added).

█ When the words of a purported threat are problematic, as was the threat here charged, it is especially critical that the instructions be tailored so that the members may intelligently determine if appellant's language expressed a present determination or intent to injure. Earlier precedents on the offense of communicating a threat emphasized that clear instructions are essential where the words do not clearly indicate an act of injury is intended. *United States v. Jenkins,* 26 C.M.R. 161, 1958 WL 3327 (C.M.A.1958). In *Jenkins,* the threat by the accused was "he would get Cooney when he came back from Alburquerque." The accused testified he meant no more than an invitation to Cooney to accompany him to the latrine and fight. The law officer erroneously defined a threat as a declaration of an intent to do a wrongful act rather than an intent to injure. In finding the instruction inadequate, the Court observed:

> The meaning of the statements in this case is not so certain. Considered by themselves, they do not unqualifiedly indicate an act of injury as distinguished from some other kind of wrongful act.... Acceptance of an invitation to engage in a fight may result in personal injury to the invitee, but the invitation is not a threat. However, the court-martial could find the offer to fight was a wrongful act, and on that basis, determine that the accused was guilty of the offense charged.

*Id.* at 162–63.

█ The words charged in Specification 2 can also mean an entirely lawful act, regardless of how rudely they may have been uttered. The fact appellant denied uttering the words does not vitiate this factor. Defense counsel even argued that Meria Gillespie stating she was going to write Ranger Morris' superiors was tantamount to stating that she would file an Inspector General (IG) complaint. Trial counsel, in a very brief rebuttal, stated that one does not file a false IG complaint. This, however, was argument of counsel, which the military judge instructs the members to disregard if in conflict with the instructions. In the instant case, the military judge correctly defined a threat, but did not tailor the definition to the facts of the case. In the absence of proper instructions, the members may well have concluded that the appellant was guilty for uttering the words merely because his conduct was extremely boorish and disorderly, for even a complaint filed in good faith could injure Ranger Morris' reputation.

█ Where an instructional error occurs on an element of an offense, prejudice is determined by whether the court members could find the necessary predicate facts from the instructions given. *Mance,* 26 M.J. at 256. We find there is substantial risk that the members did not infer from the instructions that, to find appellant guilty of the offense, they had to find that appellant's threat was to make a false allegation against Ranger Morris. We are not convinced beyond a reasonable doubt that this error was

harmless. Therefore, appellant was prejudiced by this instructional failure. *Id.*

■ Staff judge advocates will be well advised to specifically allege the fact that renders an otherwise apparently lawful act a threat, whether that act is submitting a false allegation or some other wrong. We deem this essential when an accused is charged on the basis of acts ostensibly protected by the First Amendment and in certain instances, the UCMJ. *See* Article 138, 10 U.S.C. § 938 (1994). It is always possible for words to be protected even when the accompanying conduct might be unlawful. Every individual has the right to both complain to a law enforcement officer's superiors regarding the way he/she performs his/her duty and to inform the officer of an intent to do so, and not necessarily in a polite manner, though that is the preferred and wise method. In light of the instructional deficiency, we will set aside the findings on Specification 2, Charge II, and reassess the sentence.

### IV. FACTUAL SUFFICIENCY

We now address appellant's claim that the evidence is factually insufficient to support the findings on all remaining charges. We disagree.

To find a conviction legally sufficient, this Court must determine that, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). To find a conviction factually sufficient, we must determine that, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner,* 25 M.J. 324 (C.M.A.1987).

■ After reviewing all of the evidence of record, we conclude the evidence is both legally and factually sufficient. The only matter we specifically address in this part of our opinion is the battery offense. Appellate defense counsel vigorously attack the sufficiency of the evidence on this charge primarily because of a perceived critical conflict between the testimony of Ms. Gajdos and Ms. Childers, another park hostess and Ms. Schmidt's camper mate. Specifically, the defense argues that their testimony cannot possibly be accurate because Ms. Gajdos testified appellant struck Meria Gillespie with the antenna pole on 5 July 1995, whereas Ms. Childers testified it occurred on 11 July 1995. Interestingly, even the trial counsel and military judge had difficulty sorting this out, apparently concluding one of the witnesses simply was mistaken as to the date.

Our review of the record convinces us there is no conflict when all of the evidence is placed in context. As stated in Part I, *supra,* Ms. Gajdos testified she observed the appellant strike Meria Gillespie with the antenna pole on 5 July 1995 while appellant was in the process of breaking camp to move to another camp site. Ms. Childers testified that while appellant and Meria Gillespie were preparing to depart Padre Island, she heard Meria Gillespie say, "You hit me." It is highly significant that Ms. Childers said nothing about appellant being in the process of dismantling an antenna pole. In view of the fact that she was close enough to hear the statement made by Meria Gillespie and observed her walk away from appellant, Ms. Childers easily was in a position to observe that operation, had it in fact been in progress. What this leads us to conclude is that, while Meria Gillespie and appellant were arguing on 11 July 1995 prior to their departure, she used "You hit me" in the past tense. She actually was referring in fact to the incident of 5 July 1995 which Ms. Gajdos observed. Our conclusion is buttressed by the testimony of another park ranger, Ranger Wheeler, who relieved Ranger Morris when he went on break. When Ranger Wheeler asked Meria Gillespie on 11 July 1995 prior to her and appellant leaving the park if appellant had struck her, Meria Gillespie responded, "No, not today." The evidence is factually sufficient as to all remaining charges. Article 66(c), UCMJ. The facts are discussed further in the next assignment of error.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant next avers that he received ineffective assistance of counsel by his civilian trial defense counsel. The specific dereliction asserted by appellate defense counsel as prejudicially deficient is that appellant's civilian trial defense counsel, Mr. T, unnecessarily opened the door to evidence of other crimes, wrongs, or acts, by appellant after successfully obtaining a ruling excluding the evidence. *See* MIL.R.EVID. 404(b). We disagree and hold Mr. T's representation of appellant met the required constitutional standard.

We first will consider this averment as it relates to the findings portion of the trial. The allegation of ineffective assistance of counsel primarily involves Charge I, the assault consummated by a battery.

Prior to trial, as required by MIL.R.EVID. 404(b), the prosecution notified the trial defense team that they were in possession of evidence to the effect that appellant had been twice arrested by Wichita Falls, TX, police for abuse of his wife. The prosecution also informed the defense that they would not attempt to offer this evidence unless the defense "opened the door" thereto for rebuttal. Appellate defense counsel argue that, this prosecutorial restraint notwithstanding, civilian trial defense counsel proceeded to extract highly damaging testimony during cross-examination of a prosecution witness as well as during direct examination of appellant and a defense witness, Ranger Wheeler, and that Mr. T improperly opened the door for admission of the evidence of appellant's prior arrests during the sentencing portion of the trial.

▓▓ Any criminal accused enjoys a right to the assistance of competent counsel. AMENDMENT VI, U.S. CONSTITUTION; *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *United States v. Scott,* 24 M.J. 186 (C.M.A.1987). Counsel's performance or action is "evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is *highly deferential.*" *United States v. McCastle,* 43 M.J. 438, 440 (C.M.A.1996) (quoting *Kimmelman v. Morrison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305 (1986)) (emphasis added). Because of the many decisions which must be made before and during trial, counsel is presumed competent, and the latitude accorded counsel is wide. *Strickland,* 466 U.S. at 688–91, 104 S.Ct. at 2064–67. The burden is on appellant to establish as follows:

> First, counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the deficient performance must have prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Scott,* 24 M.J. at 188 (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064). *Accord United States v. Lonetree,* 35 M.J. 396, 412–13 (C.M.A.1992).

In testing for whether an appellant has carried this burden, this Court resolves three basic questions: (1) Are appellant's allegations true and, if so, is there a reasonable explanation for counsel's actions in the defense of the case? (2) If true, did the level of advocacy fall measurably below the performance ordinarily expected of fallible lawyers? And, (3) If ineffective assistance of counsel is found to exist, is there a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt regarding guilt? *United States v. Polk,* 32 M.J. 150, 153 (C.M.A.1991).

If appellant fails to prevail on either the error or prejudice prong of the test, the issue is resolved against him. In the instant case, there is no factual dispute between appellant and Mr. T. Appellate defense counsel rely solely on the record and argue therefrom. We also conclude that the record is more than illuminating to resolve this issue without either an affidavit from Mr. T or a hearing pursuant to *United States v. DuBay,* 37 C.M.R. 411, 1967 WL 4276 (C.M.A.1967), to amass the necessary facts. *United States v. Boone,* 42 M.J. 308 (1995). *See also United States v. Ginn,* 47 M.J. 236 (1997).

Appellate defense counsel argue that Mr. T had no valid tactical reason for getting into

the "reasons [appellant] and his wife were attending marriage counseling" during appellant's direct examination. The military judge ruled that appellant's testimony regarding the marriage counseling rendered the prior arrests admissible under MIL.R.EVID. 404(b), but because the probative value of that evidence would be substantially outweighed by its potential for unfair prejudice, MIL.R.EVID. 403 rendered it inadmissible. Therefore, appellant's claim of ineffectiveness of Mr. T reduces itself to what occurred during the testimony of Ms. Schmidt and Ranger Wheeler.

Hardly any action of counsel during a trial occurs in a vacuum. The entire record of this case convinces us that all of Mr. T's actions were within the bounds of reasonable tactics under the circumstances. We find that Mr. T had a theory of the case, and his efforts to present that theory were consistent throughout the trial, notwithstanding uncontrolled blurts from both a prosecution and defense witness. Article 66(c), UCMC, 10 U.S.C. § 866(c) (1994).

■ Mr. T, in his opening statement, suggested to the members that the alleged threats and the alleged carrying concealed weapons were the main focus of the trial. Further, he informed the members that it would be plain that appellant and Meria Gillespie argued, including arguing in public. He added, however, the Gillespies were committed to their marriage and were in therapy to help them towards that goal. His opening statement clearly reveals his strategy to have been to admit having the weapons in question but contest that they were possessed illegally while at Padre Island; and, to deny both the battery on Meria Gillespie and threats against Ranger Morris.

Appellate defense counsel points to the following exchange during the recross-examination of Ms. Schmidt as the defining moment of Mr. T's alleged ineffectiveness:

Q: Did [Meria Gillespie] say whether the striking was taking place at Padre Island or was she probably referring to a period of time in the past?

A: She told me that it was fairly continuous throughout their relationship.

The totality of the above exchange actually began near the end of Ms. Schmidt's direct examination, when she editorialized on how she was concerned for Meria Gillespie's safety because she had received reports that people had witnessed appellant "strike her on different occasions and knowing that four women a day are murdered by their spouses." Mr. T successfully objected to Ms. Schmidt's comment on the number of women murdered daily by their spouse. Further, his cross-examination obviously was aimed at establishing that Meria Gillespie was referring to a period prior to their stay at Padre Island, assuming the conversation occurred at all.

The reasonableness of counsel's tactics is not determined by success or failure, but in light of the circumstances. *McCastle,* 43 M.J. at 440; *United States v. Stephenson,* 33 M.J. 79 (C.M.A.1991). Neither will they be second guessed on appeal. *Morgan,* 37 M.J. at 410; *United States v. Rivas,* 3 M.J. 282, 289 (C.M.A.1977). While appellate counsel, in hindsight, may comfortably assert that Mr. T should not have ventured into the territory he did, we cannot conclude, as a matter of law, that his questioning was unreasonable, especially in light of Ms. Schmidt's testimony on redirect examination regarding *constant* abuse.

Further, the record convinces this Court that Mr. T's thrust, which was consistent throughout the trial, was that whatever may have occurred on prior occasions in appellant's marriage, he did not strike Meria Gillespie during those five days at Padre Island. This tactic is evident in Mr. T's assessment of the Gillespies' marriage in his opening statement and his questioning of Ranger Wheeler on direct examination, which appellate defense counsel also attack as ill-advised. The salient part of Ranger Wheeler's testimony is as follows:

Q: What took place [at the ranger station]?

A: [Meria Gillespie] was very distraught. She explained that since she had been an alcoholic since she was 15 years of age, that her mental capacity had not advanced beyond that point and that's the way Major Gillespie had to treat

her because that's as far as her emotional state had gotten, so it was okay for him to treat her that way, and *I asked if she had been struck and she said, "No, not today,"* and I asked her on several occasions if she was all right and if she wanted to go home with him and if she felt safe. She said that "Yes, as soon as he calmed down that everything would be all right," and she said that "This happens all the time," that when he gets upset, he would say things and strike her, but it blew over rather quickly, and "everything would be all right as soon as he calmed down."

(Emphasis added).

When the above exchange is evaluated in isolation, appellate defense counsel's dismay with Mr. T's questioning is understandable. At this stage of the trial, however, as a result of Meria Gillespie's testimony on cross-examination, Mr. T was boxed in with regards to Ranger Wheeler. During cross-examination, she evaded answering trial counsel's questions. Given these circumstances, Mr. T's quandary was obvious: either call Ranger Wheeler as a defense witness or wait for the prosecution to call him as a rebuttal witness and salvage what he could on cross-examination. Either way, Ranger Wheeler's testimony regarding Meria Gillespie's statements to him was admissible, period. Why? Meria Gillespie also testified, contrary to Ms. Gajdos, that, though the antenna pole fell, it never struck her.

Ranger Wheeler's testimony was unfavorable to appellant, but it also contained the only "gem" Mr. T could mine: Ranger Wheeler stated that Meria Gillespie told him appellant had not struck her on *that day*. Given the five day discrepancy on the date of the assault between Ms. Childers and Gajdos, this was consistent with Meria Gillespie's denial that appellant struck her with the antenna pole. It was also consistent with Mr. T's cross-examination theme with Ms. Schmidt: prior abuse, maybe; but not at Padre Island.

■ Even if this Court agreed with appellate defense counsel that Mr. T's representation fell below the minimum level expected, we are constrained to conclude that the second prong of the *Strickland* standard still is not met. The alleged errors simply did not impact the outcome or the reliability of the trial.

The evidence against appellant was substantial. Ms. Gajdos was emphatic regarding appellant's constant belligerency and verbal abuse of his wife and her witnessing him strike Meria Gillespie with the antenna pole. Ms. Gajdos had no stake in the trial's outcome and, therefore, no motive to falsify her testimony. With regards to the disorderly conduct (Charge III) and one of the threat charges (Specification 2, Charge II), Ranger Morris' testimony was clear and unshaken. Similarly, Ms. Schmidt's testimony on the threat to kill Ranger Morris was not shaken, notwithstanding appellant's and Meria Gillespie's testimony that Ms. Schmidt was angered by Meria Gillespie's refusal to write her a prescription for a narcotic pain reliever and appellant's reference to the Air Force's policy on homosexuality. This was more than offset by Ranger Wheeler opining that Ranger Morris and Ms. Schmidt were very truthful people.

As far as appellant's and Meria Gillespie's testimony, we find them not credible, especially Meria Gillespie. Article 66(c), UCMJ, 10 U.S.C. § 866(c). We are confident the members reached the same conclusion. Both were impeached with evidence that they had committed and were disciplined for a prior offense involving honesty: appellant for false official statement, and Meria Gillespie for larceny by false pretenses.

■ The same conclusion applies with Mr. T's questioning of Dr. Ireland during the sentencing portion of the trial. After Dr. Ireland opined on direct examination that, based on his evaluation of appellant, appellant was not a threat to himself or others, the military judge then allowed trial counsel to ask Dr. Ireland, over defense objection, if he was aware of appellant's arrest a year earlier for abusing his wife. Even if asking Dr. Ireland the question is deemed an unreasonable tactic by Mr. T, it was not prejudicial. One portion of the record is most illuminating.

Findings were announced at approximately 2000 hours, and the military judge had conveyed her intent to resume the sentencing portion of the trial the next morning. During a brief recess, the president of the court-martial, through the bailiff, inquired of the military judge "whether or not there were means to take the accused into custody this evening." The military judge informed the members that such is not normally the case when an accused is not already under restraint, and that they still had to complete the sentencing portion of the trial.

Appellant's commander ordered him into confinement after that evening's session, and the military judge ruled it was not an abuse of discretion. That decision is not before us. Nonetheless, that glimpse into the members' view of appellant at that stage of the trial could not have been lost on Mr. T that evening as he prepared for the sentencing stage of trial the next day. Therefore, the record convinces us that the evidence of the prior arrest was not prejudicial. Dr. Ireland did not change his opinion, and Meria Gillespie testified she still resided with appellant, they were dedicated to salvaging their marriage, and all of appellant's weapons were in the possession of another Air Force officer who had promised to purchase them.

The *Strickland* test is not whether appellant could have received better representation but whether he received adequate representation. We find he did and hold this assignment of error is without merit.

## VI. REASONABLE DOUBT INSTRUCTION

We have considered appellant's assignment of error regarding the reasonable doubt instruction and find it without merit. There was no error in the reasonable doubt instruction given by the military judge. *See United States v. Meeks*, 41 M.J. 150 (C.M.A.1994).

## VII. SENTENCE REASSESSMENT

■ Setting aside the findings on Specification 2, Charge II, requires us to reassess the sentence. Before we may reassess the sentence we must first determine what sentence the court-martial would have imposed in the absence of the offense in question. *United States v. Sales*, 22 M.J. 305 (C.M.A. 1986). Before we make that determination,

however, we must be reasonably certain that we can determine the highest sentence which the court-martial would have imposed absent the erroneous finding. *United States v. Peoples*, 29 M.J. 426 (C.M.A.1990). We are certain we can do so.

In view of appellant being convicted of threatening to kill a federal law enforcement officer, we are convinced that the accompanying threat to get the officer in trouble played a *de minimis* part in appellant's sentence, especially in light of his also being properly convicted of disorderly conduct, with which Specification 2, Charge II, was intertwined. Therefore, reassessing the sentence to purge the error of the improper finding, we find it nonetheless appropriate. Article, 66(c), UCMJ; *Peoples*, 29 M.J. at 426.

## VIII. SENTENCE SEVERITY

■ Appellant prays for relief from an inappropriately severe sentence. In determining sentence severity, this Court must exercise its judicial powers to assure that justice is done and that the accused gets the punishment he deserves. Performing this function does not authorize this Court to exercise clemency. *United States v. Healy*, 26 M.J. 394, 395–96 (C.M.A.1988). The primary manner by which we discharge this responsibility is to give individualized consideration to appellant, including the nature and seriousness of the offenses and the character of appellant's service. *United States v. Snelling*, 14 M.J. 267 (C.M.A.1982).

■ Our review of appellant's conduct on the days in question, including the surrounding circumstances and the relative seriousness of the offenses, leads us to conclude that his sentence is inappropriately severe. The bases of our conclusion are the *Healy* and *Snelling* factors and the manner in which the prosecution pursued the case.

Our specific concern is that appellant was continually cast by the prosecution as a dangerous individual primarily because he apparently preferred a moderately large caliber (.357 magnum) revolver handgun and hollow point cartridges and buckshot for claimed self-defense purposes. There was no evidence that appellant possessed either the pistol, the shotgun, or the hollow point am-

munition, unlawfully. Neither is there evidence that the hollow point ammunition was contraband. During the questioning of Ms. Schmidt, who had extensive knowledge of weapons, and Ranger Wheeler, trial counsel persistently pursued a theme that appellant was a menace because he preferred the weapons and ammunition mentioned when a smaller caliber pistol and less lethal ammunition would have been more than sufficient for self-defense. Trial counsel's apparent method was to prove appellant's words were a threat by demonstrating appellant's ability to carry out the threat as well as relying on the threatening words. Trial counsel's overall theme, however, was that appellant was a volatile individual who actually was bent on killing Ranger Morris.

> The present apparent ability to carry out the threat with weapons that cause destruction. Massive destruction, ladies and gentlemen. A .357 magnum revolver with hollow point bullets that maims people. Testimony of [Ranger Wheeler] told you that. A shotgun, even loaded with bird shot will blow a hole right through you shot from short range. . . .

The record does demonstrate that appellant is a volatile individual. Nonetheless, the fact of the matter is that appellant's acts would have been just as criminal had he possessed a .22 caliber pistol with the weakest ammunition available in the marketplace. Likewise for the gauge of the shotgun and the shells appellant kept with it. Therefore, barring unlawfulness, appellant should not be punished more severely for owning and possessing larger weapons.

It is noteworthy that: (1) Notwithstanding a designated park hostess, Ms. Schmidt, reporting to the Park Police appellant's threat to kill Ranger Morris and the fact that he possessed weapons in his RV and had them stored illegally with the ammunition contrary to park regulations, Ranger Wheeler felt the need to do no more than monitor the situation. Having Ranger Morris avoid appellant was accomplished by his regularly scheduled break from duty. There was no action to search appellant's motor home and seize his weapons. (2) Only one of the court members stated that he owned a handgun, and he kept it stored at another person's home out of concern for the safety of his family. (3) In light of the fact that Meria Gillespie testified that she still resided with appellant, they desired to salvage their marriage, and appellant no longer possessed weapons, the sentence obviously was not imposed to protect her from appellant.

When these factors are assessed in conjunction with the court members' desire that appellant be confined before the sentencing portion of the trial even commenced, a rare occurrence in today's court-martial practice when, like appellant, an accused has not been under any kind of pretrial restraint, *see e.g., United States v. Mahoney,* 36 M.J. 679 (A.F.C.M.R.1992) (rapist confined after findings but before sentencing, ordered released until sentence imposed), we must conclude that appellant was sentenced for factors other than his criminal acts. Therefore, we will reassess the sentence to reflect the sentence which appellant deserves. *Healy,* 26 M.J. at 395.

Reassessing the sentence on this basis, we find appropriate only so much of the sentence as provides for a dismissal, confinement for one year, and forfeiture of all pay and allowances.

## IX.  ACTION OF CONVENING AUTHORITY

Appellant was ordered confined after the findings portion of the trial, which necessitated conveying him to the Fort Sill, Oklahoma, confinement facility. Court was not adjourned that evening until after 2000 hours. Prior to adjournment, the military judge issued an order that confinement officials ensure appellant got a reasonable amount of sleep. As a result of the length of the trip and processing procedures, appellant got little sleep, and the military judge ordered an extra day of confinement credit. R.C.M. 305(k). Under these circumstances, the action of the convening authority and the court-martial order should have reflected the extra day of credit. R.C.M. 1107(f)(4)(F). Accordingly, a corrected action and order are required.

## X.  DECRETAL

The record will be returned to The Judge Advocate General for a corrected Action of

The Convening Authority and court-martial order. Unless necessary for further appellate review, the record need not be returned to this Court after the corrected action and order have been promulgated.

The findings on Specification 2, Charge II, are set aside and, in the interest of judicial economy, Specification 2 is dismissed. The remaining findings and the sentence, as reassessed, are correct in law and fact, Article 66(c), UCMJ, 10 U.S.C. § 866(c) (1994), and are hereby

AFFIRMED.

Judges GAMBOA and SENANDER concur.