**UNITED STATES, Appellee,**

**v.**

**Specialist Four David B. BULLOCK, SSN 242–96–9171, United States Army, Appellant.**

**CM 439353.**

U. S. Army Court of Military Review.

8 Jan. 1981.

Colonel Edward S. Adamkewicz, Jr., JAGC, Major Grifton E. Carden, JAGC, and Captain Dennis E. Brower, JAGC, were on the pleadings for appellant.

Colonel R. R. Boller, JAGC, Major Robert B. Williams, JAGC, and Captain John P. Galligan, JAGC, were on the pleadings for appellee.

Before JONES, GARN and LEWIS, JJ.

## OPINION OF THE COURT

LEWIS, Judge.

The appellant in this case challenges the factual sufficiency of his conviction of pre-meditated murder [1] and also asserts the military judge erred in failing to *sua sponte* instruct the fact-finders on the lesser in-cluded offense of involuntary manslaughter while engaged in an assault on the victim.

---

1. Charged with premeditated murder in viola-tion of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918, he had entered a plea of guilty to negligent homicide. Additionally, he pleaded guilty to and was convicted of wrongful appropriation of a military truck in violation of Article 121, Uniform Code of Mili-tary Justice, 10 U.S.C. § 921.

## THE FACTS AND THEIR SUFFICIENCY

Sometime in March 1979, the appellant overheard one PFC Edley make a remark explicitly sexual in nature to another soldier about appellant's wife. The appellant did not take offense concerning this until 13 June 1979 when he confronted Edley in his barracks. Edley denied the remark and they moved apart. Approaching and challenging Edley a second time, appellant was given another denial by Edley, whereupon he slapped Edley on the face. Edley retreated and one SP4 Rogers (ultimately, the homicide victim) interceded on Edley's behalf. Stepping between the appellant and Edley, Rogers told the appellant to leave Edley alone and was then himself attacked. A fight ensured, with Rogers and the appellant wrestling around. Rogers, a large, muscular weightlifter reportedly able to lift 300 pounds, subdued the much smaller appellant, letting him up after appellant said he was "cool." Once up, the appellant said, "I'll show you how cool I am. That's alright. I'll get you", and withdrew to the other end of the barracks bay where his bunk and equipment were located.

He pulled an entrenching tool from his duffel bag and, approaching Rogers again, opened the shovel blade, tightened its locking nut and raised it as if to swing. When the appellant reached a distance of two feet from where Rogers was standing, Rogers rushed forward, grabbed the tool (or appellant's wrist) with one hand and punched the accused several times in the face with his other hand. This second attack ended quickly when other soldiers removed the entrenching tool from the appellant's grasp. The appellant, angry and upset, immediately left the barracks saying, "I've got something for your ass later."

Within 30 minutes, the appellant walked over to the arms room in a nearby building, drew a caliber .45 pistol on the pretext of needing it for guard duty, and returned to the barracks. While at the arms room, the appellant specifically requested that he be issued ammunition. This required a correction on the weapon and ammunition issue log inasmuch as it was not the armorer's original intention to issue the ammunition. Apparently the rounds were loaded into the magazine and the magazine inserted into the pistol by the appellant enroute back to his barracks.

Upon arriving back at the barracks, the appellant went directly to the vicinity of Rogers' bunk on which Rogers was lying in his sleeping bag. The appellant appeared to be calm. He operated the slide of the pistol, chambering a round, and said, "Don't move" and "I told you I was going to get you." Rogers shouted, "He's got a gun." A succession of shots was fired. Understandably, considering the action and their individual apprehensions of personal peril, the nine witnesses to the event vary slightly in their accounts. Carefully weighing the evidence, however, we are satisfied with the following scenario. The appellant first fired when Rogers had commenced rising from his bunk. The pistol was pointed at Rogers and the bullet struck the window jamb at a height of 5 feet 2 inches directly in line with where Rogers was coming to a standing position. According to the report of autopsy, Rogers was 5 feet 10 inches tall. Very quickly thereafter, the appellant fired a second shot with the pistol pointed directly at Rogers as Rogers approached and appellant began to back up. This bullet also missed and struck the corner of the room at a point seven inches above the floor and in line with where Rogers and the appellant were as Rogers rounded the end of his bunk and appellant moved backward.

The testimony varies markedly at this point. Some witnesses had Rogers grabbing both wrists of the appellant as the third (and, according to one, the fourth) round was fired. Most, however, testified that Rogers was "slapping" at the pistol in order to keep it from pointing at him. Finally, though occasionally inconsistent as regards whether it was the third, fourth or fifth shot that struck him, most witnesses agreed that Rogers appeared to slip to one knee immediately prior to the accused firing the fatal shot. According to a highly articulate sergeant, the appellant had man-

aged to free his gun arm and, in slow, deliberate fashion, brought the gun to the mid-chest area of Rogers. Rogers appeared to "suddenly go weak" and the appellant fired. The bullet from this shot, the only one to hit Rogers, entered the middle of his chest and followed a downward, front-to-rear path approximately 45° from the vertical. Rogers subsequently died from this shot, which fact is uncontested by the appellant who pleaded guilty to negligent homicide.

In our view, the record clearly establishes the premeditated nature of the homicide. We do not know what prompted the appellant's sudden outburst against Edley after allowing his grievance to smolder for three months. We do know the persistence and depth of his anger, however. This was immediately transferred to Rogers when Rogers intervened as a peacemaker. Attacking Rogers, he was soundly defeated with little or no physical injury resulting. However, that he suffered major damage to his ego was manifested both by his threats and his immediate return to the attack wielding an entrenching tool. This time, he was punched several times in rapid succession before he was disarmed and left to retreat to re-arm himself with a weapon more lethally effective. As he departed, he uttered more threats. Contrary to his testimony, we find that the appellant specifically requested five rounds of ammunition to go along with the pistol that he drew from the unit armorer under false pretenses. The armorer did not originally proffer them. Appellant loaded the weapon, entered the barracks, chambered a round, repeated his previously announced intention to "get" Rogers and commenced firing.

The appellant at trial made much of the fact that he was a qualified marksman but missed with his first round when Rogers was either immobile or just beginning to move. This, he argued, established his lack of intent to wound Rogers, much less kill him and, still less, kill him with premeditation.[2] We disagree. Against the back-

ground of his prior anger, his two prior unsuccessful attacks against a clearly superior opponent, his threats, his deliberately obtaining a weapon and ammunition and his loading the pistol, we view his miss with the first round as solely the product of ineptitude, not appellant's design or desire. His succeeding misses were the result of his victim's efforts to slap the pistol and keep it from pointing at him as the appellant fired. Ultimately, when his victim slipped to one knee, the appellant achieved his purpose and killed Rogers as he had determined to do when he obtained the pistol.

## THE INSTRUCTIONS ON THE OFFENSES

The military judge instructed the members of the court-martial on the elements of premeditated murder, the charged offense. Additionally, he instructed them on the elements of the lesser included offenses of unpremeditated murder, murder while engaged in acts inherently dangerous to others and evincing a wanton disregard for human life, voluntary manslaughter, involuntary manslaughter while in the commission of an act of culpable negligence, and negligent homicide (to which the appellant had pleaded guilty). Both at an earlier out-of-court hearing and following instructions, the military judge afforded counsel the opportunity to request additional instructions. Neither then nor at any other time did appellant's counsel object to the instructions or request additional ones. He now claims error in that the judge did not *sua sponte* instruct on the lesser included offense of involuntary manslaughter while engaged in an assault.

We must agree with appellant that there is a responsibility in the military judge to *sua sponte* instruct on all included offenses reasonably raised by the evidence, *United States v. Clark*, 22 U.S.C.M.A. 576, 48 C.M.R. 83 (1973). We note in passing, however, that the failure of defense counsel to see an included offense as being raised and therefore failing to request an instruc-

---

2. The theory of appellant's defense at trial was that he merely intended to frighten Rogers and

cause him to "back down", presumably to be humbled.

tion thereon lends logical support to a conclusion upon later review that the evidence was insufficient to raise it. Notwithstanding, in the instant case, we agree with the appellant that involuntary manslaughter while engaged in an assault was lesser included within the premeditated murder specification and was raised by the evidence. Accordingly, an instruction thereon was required and the military judge erred in failing to give it.

■ Nevertheless, we are fully satisfied that the accused suffered no prejudice.[3] Prior to findings, the military judge instructed the court-members in the mechanics of their voting procedure. He told them they should commence with the offense charged. If they failed to achieve the requisite vote to convict of that offense, the accused stood acquitted of that offense and they could then proceed to consider and vote upon successive lesser included offenses.[4] Whatever might be theoretically argued concerning the psychological effect on the minds of the court of having one or two still lesser included offenses remaining after acquitting on the principal charge and other included offenses need not delay us here.[5] Presuming, as we must, that the court followed the judge's instructions,

---

3. We are not unmindful of the view of the Court of Military Appeals on the question of prejudice resulting from the omission of instructions on a lesser included offense. The majority and dissent in *United States v. McGee*, 1 M.J. 193 (C.M.A.1975), thoroughly treated the matter. Chief Judge Fletcher, writing for the majority, rejected the government's argument that there is no prejudice " ... so long as the trial judge instructs on an offense greater in degree than the omitted offense, but lesser in degree than the offense of which the accused ultimately is found guilty." Said Judge Fletcher,

> The fallacy in the premise of such a test for prejudice lies in its assumption that lesser included offenses can be arranged vertically in terms of relative severity.

> .    .    .    .    .

> Because appellate authorities can only speculate as to what the jury's verdict would have been had the trial judge properly enumerated all the lesser included offenses, we believe that prejudice is inherent in the trial judge's omission ... for there is always a reasonable possibility that the court members were misled in resolving the accused's guilt. *Id.*, at 194, 195.

Significantly, the instruction improperly omitted in *McGee, supra*, was that for involuntary manslaughter through culpable negligence. Proper instructions had been given for premeditated murder (the offense charged), unpremeditated murder, voluntary manslaughter (of which McGee was convicted), involuntary manslaughter while perpetrating an assault, and negligent homicide. The source of Judge Fletcher's discomfort is therefore readily apparent. The "relative severity" of the two forms of involuntary manslaughter vis-a-vis one another cannot be determined with reasonable certainty, and the omitted offense might well have been next under the offense of which he was convicted. The psychological effect on a court or jury of instructions of an offense "next under" is developed in Footnote 5, *infra*.

The other recent cases of *United States v. Staten*, 6 M.J. 275 (C.M.A.1979); *United States v. Jackson*, 6 M.J. 261 (C.M.A.1979), and *United States v. Johnson*, 1 M.J. 137 (C.M.A.1975), unlike the case *sub judice*, also involved the omission of an instruction on the lesser included offense next under the offense of which the accused was convicted. Accordingly, they too may be distinguished. Finally, these latter cases lack the full treatment of the prejudice issue afforded by *McGee, supra*.

4. *See* paragraph 74b(3), Manual for Courts-Martial, United States, 1969 (Revised edition).

5. This effect is well-known to trial practitioners. It involves a variety of mental processes and attitudes of a civilian jury or military court. If the facts of a case are in serious dispute and members of the jury or court initially possess even a modicum of doubt as to guilt of a greater offense, the fact that there is a lesser included one immediately at hand will often afford a means to avoid final resolution of the more difficult original issue. Knowing there is a next lesser offense and its elements therefore allows a vote of not guilty on the greater offense to be rationalized. Naturally, the rationalization is most complete where the distinction in the elements of the lesser offense as compared to the greater offense matches the area of original doubt. In this way, the logical mind will "trial-fit" the facts to the elements of the offense considered, but with the mind's eye looking ahead at the elements of the offense next under to see whether the fit is not more comfortable.

In addition to the preceding individual mental process, such collective processes as compromise verdicts are also acknowledged by practitioners (although not affording an entitlement to a "lesser included" instruction where the evidence does not raise it). By no means are these the only processes that give rise to this effect. Doubtless, there are others. Each of them, however, depends upon the availability of an offense next under the offense under consideration.

*United States v. Ricketts,* 23 U.S.C.M.A. 487, 50 C.M.R. 567 (1975), the members both began and ended with their single vote on the murder specification as alleged. Achieving the requisite vote, they did not pass on to consider even the first lesser included offense. Consideration of the lesser included offense of involuntary manslaughter while in the commission of an assault was omitted not by virtue of any failure to instruct on it but because of the court's stopping when they convicted the appellant of an offense four or five times removed in the prescribed voting sequence. On this basis, we do not rely upon rank ordering lesser included offenses and need not speculate as to what the court's findings would have been on more complete instructions. We know what it would have been—the same as it was. The judge's error of omission was totally harmless and does not warrant reversal. Article 59, Uniform Code of Military Justice, 10 U.S.C. § 859.

The findings of guilty and the sentence are affirmed.

Senior Judge JONES concurs.

GARN, Judge, dissenting in part and concurring in part:

I am not convinced that the appellant specifically intended to kill Specialist Rogers and therefore cannot concur in affirming the findings of guilt of the offense of premeditated murder.

I agree that the military judge's failure to give instructions regarding a form of involuntary manslaughter reasonably raised by the evidence did not harm the appellant and does not warrant reversal.