UNITED STATES, Appellee,

v.

Jeffry L. VAN SYOC, Senior Airman,
U.S. Air Force, Appellant.

No. 67,780.
ACM 28725.

U.S. Court of Military Appeals.

Argued Jan. 5, 1993.

Decided April 29, 1993.

For Appellant: *Lieutenant Colonel Terry J. Woodhouse* (argued); *Major Mary C. Yastishock* and *Captain Robert J. Smith* (on brief); *Colonel Jeffrey R. Owens, Major Alice M. Kottmyer, Captain Michael D. Burt.*

For Appellee: *Major Paul H. Blackwell, Jr.* (argued); *Colonel Richard L. Purdon* and *Lieutenant Colonel Jeffery T. Infelise* (on brief); *Lieutenant Colonel Brenda J. Hollis.*

*Opinion of the Court*

GIERKE, Judge.

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of unpremeditated murder of his infant son, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. Appellant was sentenced to a dishonorable discharge, confinement for 22 years, total forfeitures, and reduction to E–1. The convening authority reduced the confinement to 14 years but approved the remainder of the sentence.

This Court granted review of three issues raised by appellate defense counsel and one modified issue as follows:

I

WHETHER THE EVIDENCE ADDUCED AT TRIAL WAS LEGALLY INSUFFICIENT TO SUPPORT THE FINDINGS OF GUILTY.

## II

WHETHER THE MILITARY JUDGE ERRED TO APPELLANT'S SUBSTANTIAL PREJUDICE BY PERMITTING EVIDENCE REGARDING A POEM WRITTEN BY APPELLANT WHILE HE WAS IN HIGH SCHOOL.

## III

WHETHER THE ADDENDUM TO THE STAFF JUDGE ADVOCATE'S RECOMMENDATION CONTAINED NEW MATTERS NOT PROVIDED TO APPELLANT OR TRIAL DEFENSE COUNSEL BEFORE THE RECORD WAS FORWARDED TO THE CONVENING AUTHORITY FOR ACTION.

## Modified Issue

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT BY REFUSING TO INSTRUCT THE MEMBERS ON THE DEFENSE OF ACCIDENT.

## I. Factual Background

On the afternoon of March 9, 1988, appellant's wife left their 3–month–old child in appellant's care. At 4:09 p.m., the security police received an urgent call from appellant, who related that his child had stopped breathing. An emergency medical team from the base hospital immediately responded and found appellant trying to revive the infant by mouth-to-mouth and cardio-pulmonary resuscitation. First Lieutenant Lotsch, a physician's assistant, asked appellant what had happened, and appellant responded that he was changing the baby's diaper "and he just stopped breathing." Lieutenant Lotsch remembered that appellant seemed upset.

Staff Sergeant Webb, an emergency medical technician assigned to the emergency room of the base hospital, was in the emergency room when the ambulance bearing appellant's child arrived at the hospital. After "code procedures" to revive the child were begun, Sergeant Webb took over the role of comforting the child's parents. She testified as follows:

Q. Do you remember hearing from the accused what happened?

A. Yes sir, I do.

Q. Would you please explain to the members the setting, and how he said it and what he said?

A. We were sitting in the OIC's office in the emergency room. That's where we put the family members of a code victim. He had come in ... he was crying when he initially came in and he was sitting in one of the chairs and he told me that he had been holding the baby and the baby squirmed and fell out of his arms. He was standing up and he said ... he held his arms out at a 90 degree angle and said the baby fell out of my arms, when he first came in.

Q. Then, what did he say happened?

A. He didn't say much for a long time; he closed up into himself and didn't say much for awhile.

Q. Where did he go?

A. He was still in the office, in the OIC's office and he was fidgeting in his chair and moving around a little bit and then all of a sudden he would say something like, the baby was laying on the couch and he just fell off and then he'd be quiet again for awhile and my role as family support member is not to really do anything other than offer coffee, offer a shoulder, kleenex, just support. So, he would get quiet again and then he'd just start talking again and one time he said, I was putting the baby in the swing and he fell out of my arms onto the floor and then he would be quiet again for awhile and then he would go back to the story where he was holding the baby with his arms in a 90 degree angle like this (Witness extended both arms at approximately a 90 degree angle.) and the baby fell out of his arms onto the floor.

Q. Three separate accounts of what happened?

A. Yes, sir.

The infant was diagnosed as suffering from a "head bleed" which caused significant brain damage. He was transferred to Lubbock General Hospital, where he lapsed into a vegetative state and eventually died on December 20, 1988.

Mrs. Van Syoc, appellant's ex-wife, testified that appellant would sometimes try to stop the baby's crying by "screaming" at the baby, telling him to "shut up, shut up." Appellant told his wife that the baby's crying "hurt his ears, ... like a plane taking off, the same decibels or something." Mrs. Van Syoc testified that on one occasion the baby "had been crying and all of a sudden it got really muffled and he [appellant] had two fingers over the baby's mouth." Appellant told his wife that he was "trying to block the noise" because it hurt his ears. Except for the manner in which he tried to stop the baby from crying, appellant was "usually very careful about" the way he held the baby.

Mrs. Van Syoc testified that the baby seemed normal and was sleeping when she left him with appellant. When she returned home, a neighbor told her that the baby had been taken to the hospital. When she arrived at the hospital, the first thing she heard appellant say was, "Oh God, she's never going to let me hold him again." Mrs. Van Syoc asked appellant what he meant, and he replied:

I'm sorry, honey ... I dropped him.... I was picking him up out of his crib ... I had just changed his diaper and he wiggled or squirmed or moved and I couldn't hang on to him. I wasn't expecting it and I dropped him, and ... as soon as he hit the floor he became unresponsive.

Dr. John Turnbow, an expert in pediatrics, first examined the baby on March 10 at Lubbock General Hospital. He found no signs of external trauma but evidence of "bleeding in the head." In his opinion the injuries were "non-accidental" and "not consistent" with appellant's explanation.

After the baby had been at Lubbock General Hospital for about 5 weeks, Mrs. Van Syoc asked one of the doctors to show her the "CT scans." The doctor told Mrs. Van Syoc and appellant that the baby was suffering from shaken-baby syndrome. The doctor explained the syndrome as existing "when the parent or somebody gets violently angry with the child, picks the child up and ... shakes them so violently that it causes massive brain damage." Mrs. Van Syoc testified that she had never punished the baby and had never shaken him.

Dr. Jin Song Leo, an expert in diagnostic radiology and neuroradiology, testified that the baby's injuries were not consistent with a "simple fall" but were consistent with the shaken-infant syndrome. Likewise, Dr. Howard Morgan, a neurological surgeon, concluded that there was a high probability of "the type of acceleration and deceleration of the head that is seen in what's called the shaken-baby syndrome."

Dr. Wilber L. Smith, an expert in pediatric radiology, concluded, based on the presence of old blood in the brain, that there were at least two shakings, with one of them preceding March 9 by at least 14 days. In his opinion the fatal injuries were inflicted on March 9. Dr. Smith's diagnosis was that the baby "suffered from ... at least two major episodes of shaking." He testified that dropping the child could not have caused the injuries. Asked if this was a close case, Dr. Smith responded, "No, sir. This is a straight forward case."

Dr. Randell Alexander, a pediatrician, testified that, based on the pattern of injuries suffered by the Van Syoc baby, they could not have been caused by a fall, even if the baby hit the edge of the crib on the way down. In his opinion the Van Syoc baby suffered from a repetitive, oscillating force consistent with shaking but not consistent with a single impact. He testified that the shaking in this case would have been "extremely severe" and prolonged, "in the order of seven to ten shakes at a minimum."

Dr. Zumwalt, a forensic pathologist, interpreted the medical records and examined the victim. Dr. Zumwalt testified that the injuries were "classical for a Whiplash Shaken Infant." He testified that the ex-

planations offered by appellant were not consistent with the injuries.

Appellant presented no evidence on the merits. The defense argued that the baby's death was an accident, relying on the testimony of prosecution witnesses, Mrs.Van Syoc and Sergeant Webb, who related appellant's claim that the baby had squirmed and fallen from his arms.

Both the prosecution and the defense requested that the military judge instruct the members on the defense of accident. The military judge initially agreed to give such an instruction but then reversed his ruling and refused to give an accident instruction, explaining that he did not believe that an "innocent explanation" for the baby's death raises the defense of accident. Notwithstanding his ruling, the military judge informed defense counsel that "you can argue that in terms of the lay use of the word accident, you know, it was an accident."

## II. Discussion

In this case, the prosecution had the burden of proving that appellant "had the intent to kill or inflict great bodily harm upon" his infant son. *See* para. 43b(2)(d), Part IV, Manual for Courts–Martial, United States, 1984. The prosecution theory was that appellant killed his infant son by violently shaking him and that appellant's intent to kill or inflict great bodily harm could be inferred from appellant's violent acts. The military judge properly instructed the members on circumstantial proof of intent, as follows:

> [I]t may be inferred that a person intends the natural and probable results of an act he purposely does. Therefore, if a person does an intentional act which is likely to result in death or great bodily harm, it may be inferred that he intended to inflict death or great bodily harm. The drawing of this inference, however, is not required.
>
> &ast; &ast; &ast;
>
> I have instructed you that the intent to kill or to inflict great bodily harm must be proved beyond a reasonable doubt.

Direct evidence of intent is often unavailable. The accused's intent, however, may be proved by circumstantial evidence. In deciding this issue, you must consider all relevant facts and circumstances including but not limited to the force demonstrated by the expert as required to produce the shaken baby injury, the testimony of the witnesses as to the extent and the nature of the injuries.

*See* para. 43c(3)(a).

The defense theory was that the baby's death was an accident. The affirmative defense of accident is defined in RCM 916(f), Manual, *supra*, as follows: "A death, injury, or other event which occurs as the unintentional and unexpected result of doing a lawful act in a lawful manner is an accident and excusable." This Court has held that the defense of accident has three elements:

> First, evidence must be introduced that the accused was engaged in an act not prohibited by law, regulation, or order. Second, this lawful act must be shown by some evidence to have been performed in a lawful manner, *i.e.*, with due care and without simple negligence. Third, there must be some evidence in the record of trial that this act was done without any unlawful intent.

*United States v. Ferguson*, 15 MJ 12, 17 (1983) (citations omitted). In deciding whether an instruction on accident is required, the question is whether "evidence [was] presented . . . to which the members might attach credit which would raise the defense of accident." *Id.* at 17. "Any doubt whether the evidence" raises an affirmative defense requiring "an instruction should be resolved in favor of the accused." *United States v. Steinruck*, 11 MJ 322, 324 (CMA 1981), citing *United States v. Staten*, 6 MJ 275 (CMA 1979). The duty to instruct arises whenever "some evidence" is presented raising the defense, RCM 916(b); it need not "be compelling or convincing beyond a reasonable doubt." *United States v. Jackson*, 12 MJ 163, 166–67 (CMA 1981). The duty to instruct arises whether the evidence raising

the defense comes from prosecution or defense witnesses. RCM 916(b), Discussion. *See United States v. Buckley,* 35 MJ 262, 264 (CMA 1992); *id.* at 264–65 (Gierke and Wiss, JJ., dissenting).

### III. Conclusion

■ We hold that the defense of accident was reasonably raised by the testimony of Mrs. Van Syoc and Sergeant Webb, each of whom described appellant's innocent explanation for the baby's injuries. The military judge erred when he ruled that appellant's innocent explanation for the baby's fatal injuries did not raise the defense of accident and when he denied the defense request for an instruction on accident. *See United States v. Ferguson, supra.*

■ We hold further that the error was prejudicial because it deprived the defense of an instruction on their theory of the case. Although the military judge properly instructed the members on the prosecution theory that they could infer appellant's intent to kill or inflict great bodily harm, he refused to instruct on the defense theory that the baby's death was an accident and that the prosecution had the burden of proving beyond a reasonable doubt that the fatal injuries were not accidentally inflicted. Given the posture of the evidence and the theories of the parties in this case, we are not satisfied that the error was harmless. *See generally United States v. Mance,* 26 MJ 244, 254–57 (CMA 1988).

In light of our disposition of this issue, we need not address the merits of the remaining granted issues.

The decision of the United States Air Force Court of Military Review is reversed. The findings of guilty and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.

Judges COX, CRAWFORD, and WISS concur.

SULLIVAN, Chief Judge (concurring):

I agree with the majority opinion in this case. However, I am puzzled by the military judge's decision to permit this defense to go to the members by way of counsel arguments without legal guidance. *See generally United States v. Ferguson,* 15 MJ 12, 17 (CMA 1983); *see* RCM 916(b) and (f), Manual for Courts–Martial, United States, 1984.

Defense counsel proposed that an accident instruction be given in this case and submitted his desired instruction. Trial counsel agreed that an accident instruction should be given but proposed his own instruction. The military judge, albeit reluctantly, agreed to give an accident instruction combining those instructions proffered. The record states the following:

MJ: Well, let me tell you the difficulty that I have with accident in this case, Colonel Newhouse. Which accident [sic] that was being done in a lawful manner?

DC: Caring for his son, your honor.

MJ: Okay, well ... you know, I hate to think out loud on the record, but it strikes me that accident in this context, in the defense counsel's context, that is an affirmative defense, contemplates a pro-active event. That is to say, the accused was actually doing something such as firing at the firing range, playing baseball, or in some way ... boxing ...

DC: In this case, your honor, it says over and over again about he's changing his diaper and the baby fell, an accident. That's our contention, it was an accident. These other things resulted ... resulted from an accident.

MJ: Well, that's enough of my interest. Accident ... the unforeseen circumstances of a child falling backwards, falling over backwards over the crib, or something, or wiggling out of his hands....

DC: Correct.

MJ: I guess my concern is that that is not accident as it's viewed by the law

in this context. That is, that is just an event, I mean, you know.

DC: It's an accident. You don't mean for the baby to fall out of your hands, you're trying to change his diaper, you don't mean for that to happen, but it's an accident.

MJ: Well, I'm sorry, but you also didn't do anything to the baby. I mean, you weren't doing anything to the baby when the baby fell over.

DC: You're changing his diaper, it was an accident. He fell out of your hands....

MJ: I will give you the benefit of the doubt. I will give the defense of accident. I'll try to combine Appellate Exhibits X and XII. I'm not altogether sure that I need to comment on the evidence in terms of what the prosecution says or what you say. Okay, I'll give the bulk of Appellate X, I'll change it in a way which is to me more evenhanded, and I will allow both parties to comment prior to instructing.

The next day, however, the judge reversed his ruling. The record states:

DC: You also informed me previous ... earlier this morning, your honor, that you're not going to instruct on accident, that we're going to have to argue that. I'm just noting for the record that yesterday we did ask for that and we still do have an objection to your not....

MJ: Right. The instruction that you suggested as well as the response by the United States to your suggestion dealing with accident ... as I recall, as I indicated yesterday that I would consider it. I have considered it and I just don't think that what is an innocent explanation as to wanting to believe the evidence that the baby fell inadvertently; that is an innocent explanation. In my mind, that does not raise [sic] to the level of accident as the law contemplates.

DC: Well, we still have a continuing objection. We think you ought to include accident.

MJ: Right; I understand. You requested that I give the defense of accident. *Request denied, but you can argue that in terms of the lay use of the word accident, you know, it was an accident.*

DC: Very good.

MJ: Anything else?

DC: We have nothing further on instructions, your honor.

(Emphasis added.)

Defense counsel argued accident to the members as follows:

Now, getting to the real defense theory of what happened. It was an accident. I was trying to think of an analogy to help you understand my position on it. Talking to Staff Sergeant Watson who helped us to get our case together and he gave me the best I could come up with. He said, compare it to ... if you work in an organization that has a library art collection and they go out and buy a multi-million dollar painting, hang it on the wall and then they buy a thousand dollar nail to hang it [up] with, some kind of contraption, not knowing that this one has been refurbished and used by the government earlier and they put it up and hang it on the wall and it stays there for six months to a year. You walk in one day and you slam the door behind you and it falls. The frame breaks; the multi-million dollar picture's laying there; you pick it up. Somebody else hears the fall, comes running in and they come in and you're holding the picture and they say, oh my God what happened to the picture and you say, it fell off by itself. They don't believe you. They say, it couldn't fall off by itself and you said, of course it did. They say, it looks like the nail is broken; you say the nail broke? You look at the nail; it takes 500 lbs. of pressure to break the nail and you say, well maybe it's a bad nail, something was wrong with the nail. How do you defend yourself against that? Compare that to the faulty nail, a mother that had a terrible pregnancy. I think she testified that she threw up as much as 16 times a day.

She was finally hospitalized, was dehydrated. They gave her beaucoup medication for the nausea. She had a hard pregnancy. The infant was delivered by the vacuum technique. After the delivery, it had an exceptionally high bilirubin. Within three weeks ... it stayed in and had jaundice ... it stayed in the hospital an extra week but it was out less than two weeks before it was back, had a spinal tap, which is taking spinal fluid out from underneath the brain. You've got a faulty nail already. It's very logical that the infant could've had seizures or had a pre-existing disorder. The fall could have been a result of a seizure, a stroke, whatever. When we look at it, it's just not the normal case. I'm not saying that anybody did anything wrong, it's just an accident.

Trial counsel argued there was no accident. He said:

Again, the defense theory comes up as accident. At this point, Major Burr again begins to degrade the mother, tells you what a rotten person Karen Van Syoc was, throw that mud, hope it would stick if it didn't the first time. And, then he said, well this is an accident. Picture falls when you walk in. Pictures will fall but upon closer examination, you'll find out why it fell. Wasn't placed in the wall solidly or it was a faulty nail. I think a better example ... I noticed a lot of maintenance badges, a lot of flyers. Think about an airplane crash. Now, to the uninitiated and those of us who don't know a lot about airplanes, it's really easy to say that I'm not going to fly because airplanes crash. No reason, they just crash; it's an unsafe way of flying. Every one of you knows that planes don't just crash. When an airplane does fall out of the sky, we convene a safety board. There might be a collateral investigation. We talk to the mechanics; we find out what the pilot was doing. We find why that airplane went down. We'll find out whether or not there was a fuel pump that should've been pumping. We will find out whether or not it was the pilot who didn't get a good night's sleep. We will find out down to the question of just whether a pilot didn't put on enough after-burners while making a turn that caused that airplane to fall. There's a reason for it. It doesn't just happen and now, in this case, you've seen the results of an injury and now you've found out why it happened. Babies don't just die.

I agree with the majority opinion that appellant was entitled to members who received proper legal instructions on the defense of accident. Defense counsel's accession to the military judge's imposition of a jury nullification approach to this matter did not constitute waiver or render this error harmless. *United States v. Landrum*, 4 USCMA 707, 714, 16 CMR 281, 288 (1954). A legally uninformed and unguided court of members is not the norm at courts-martial. *See generally* Art. 51(c), UCMJ, 10 USC § 851(c); RCM 920(e)(3).