**UNITED STATES**

v.

**Darwin DAVIS, 379–80–0254, Hospitalman (E–3), U.S. Navy.**

**NMCM 97 01012.**

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 9 April 1996.

Decided 27 April 1999.

Robert A. Parks, Civilian Defense Counsel.

Maj Stephen D. Chace, USMC, Appellate Defense Counsel.

LT James E. Grimes, JAGC, USNR, Appellate Government Counsel.

Before SEFTON, Chief Judge, DORMAN, Senior Judge, and TROIDL, Appellate Military Judge.

DORMAN, Senior Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of making a false official statement and involuntary manslaughter, in violation of Articles 107 and 119,[1] Uniform Code of Military Justice, 10 U.S.C. §§ 907 and 919 (1994). The approved sentence includes 8 years confinement, forfeiture of all pay and allowances, reduction to pay grade E–1, and a dishonorable discharge.

We have carefully considered the record of trial, the appellant's three assignments of error, and the Government's response. We have also considered the excellent oral arguments of counsel and the supplemental briefs filed after argument. Upon review we have found error. Following our corrective action, we conclude that the findings and sentence

---

1. Appellant was charged with the unpremeditated murder of his daughter "by means of striking and shaking her." The members found the appellant not guilty of that offense but guilty of the lesser included offense of involuntary manslaughter. The involuntary manslaughter was based upon the members' determination that the appellant struck and shook his daughter while participating in the commission of an assault consummated by a battery upon her. Record at 1417, 1429.

as modified, are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. Arts. 59(a) and 66(c), UCMJ.

## Sufficiency of Evidence

In his first assignment of error, the appellant argues that the evidence of record was factually insufficient to support his convictions of both making a false official statement and involuntary manslaughter. The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner,* 25 M.J. 324, 325 (C.M.A.1987). In resolving the question of factual sufficiency, we have carefully reviewed the record of trial and the briefs of counsel. Based on that review we are convinced beyond a reasonable doubt of the appellant's guilt of involuntary manslaughter.

In May 1995, Shaquala Davis, the victim and the appellant's infant daughter, died as a result of edema, a swelling of the brain that cuts off its ability to maintain life support functions. This fact is undisputed, as is the fact that the cause of the edema was a subdural hematoma. What is in dispute is how these injuries were sustained.

The appellant maintains that while on his way to pick up his wife from work on 9 May 1995 he was involved in a car accident, which was not his fault. The appellant claims that while going about 50 kilometers per hour (about 31 miles per hour) he swerved sharply to avoid hitting two motorcycles that ran a red light and that were headed towards him in his lane of traffic. He claims that while swerving he crossed over a "chatter bar" type median strip into the oncoming lane of traffic, swerved back to his side of the road and braked firmly to a stop, without skidding. His vehicle did not collide with any object.

According to the appellant, the victim was sitting in a car seat behind the passenger seat, in the rear seat of the appellant's car. Upon initial assessment of the victim for injuries, appellant discovered that her car seat had come forward and that she had fallen out of it onto the floor behind the passenger seat. She was crying. Appellant placed her back in her correct position and looked her over, but did not see any injuries. Assuming everything was fine, he then proceeded to where he was to pick up his wife. Once there, the appellant fell asleep while waiting for her.

When appellant's wife got off work, she approached the vehicle, knocked on the window and was let in. The appellant informed her of what had happened. His wife examined the child and found her to be breathing with difficulty and suggested taking her to the hospital. While on the way to the hospital, the appellant noticed that his daughter was not breathing. He stopped the car and performed CPR while his wife sought a phone to call for an ambulance.

An ambulance arrived and took the victim to a local Japanese hospital. Upon arrival, she had no signs of external injuries, but she was not breathing. After she was stabilized, she was transferred to the Naval Hospital at Yokosuka. The general surgeon, Dr. Baxter, testified that upon arrival she was in a deep coma, and was being "bagged," or artificially respirated. An emergency "CT" scan showed that the entire brain was swollen, but there was no evidence of any intercranial bleeding. It also revealed retinal hemorrhaging in one eye. Dr. Baxter also observed some minor bruising around the victim's nose and mouth that could have come from the face mask that had been placed on her. In the meantime, a hospital with a neurosurgeon was located and the victim was transferred to Chigasaki Hospital.

At Chigasaki, the victim was examined by Dr. Hosoda, a neurosurgeon, who believed that her injuries were "not survivable." He determined there was a "moderate" retinal hemorrhage in the left eye but he was unable to determine whether there was bleeding in the right eye. The victim was placed on a respirator and monitored, but her vital signs became weaker and weaker until she died.

Naval Criminal Investigative Service [hereinafter NCIS] Special Agent [hereinafter SA] Beltz interviewed the appellant at the Chigasaki Hospital. The appellant told

SA Beltz about the traffic accident, and also stated that he had buckled the victim into a child protective seat in the backseat of the vehicle but had forgotten to buckle the seat belt to the safety seat. On 6 June 1995, following the autopsy, SA O'Connor re-interviewed the appellant after advising him of his rights under Article 31, UCMJ. The interview resulted in the appellant providing a signed and sworn, written statement. Prosecution Exhibit 9. The appellant once again related the information about how he swerved to avoid the two motorcycles. Regarding the position of the victim in the car, and how she was secured, the appellant stated:

> My daughter was on the floor-board in front of the rear seat, half twisted out of her car seat and crying. She was still too small for the straps on the car seat. The car seat was resting on top of her. The cushion bar on the car seat was still in the down position. The car seatbelt for the left rear seat had somehow disconnected and allowed the car seat to fall forward. I remember last securing the buckle about a week ago and had not checked it since then.
>
> . . . .
>
> I've been told that my wife insists that I told her after the accident that I forgot to buckle my daughter in her car seat and only had the cushioned bar pulled down. This is not true. My wife does not understand me sometimes because her English is poor. I am sure that I buckled my daughter into the car seat. Only the car's seat belt became disconnected during the accident.

Prosecution Exhibit 9.

After the appellant signed the statement, he and SA O'Connor went to the Japanese police station where the appellant's car was located, so that he could demonstrate what happened. SA O'Connor wanted the appellant to demonstrate how the car seat flipped over because every time SA O'Connor had tried, he could not get the car seat to end up on the floorboard of the car. Prosecution Exhibits 7 and 8 show the relative position of the car seat in the car with the appellant

trying to cause the car seat to flip over onto the floorboard. With the passenger seat all the way forward, the appellant had to manipulate the car seat to get it to go onto the floorboard.

After the appellant demonstrated the position of the car seat, SA O'Connor took him back to the NCIS office for more questioning. SA O'Connor told the appellant that, based on the demonstration, he did not believe the appellant and asked the appellant to tell him what really happened. The appellant became visibly upset and then made the following statement:

> This afternoon I went to the Taura Police Station with Special Agent O'Connor and tried to show how my daughter was injured in her car seat, by sitting in my own car and trying to adjust the car seat in the back seat. I found it really hard to do. I want to say now that I didn't tell the complete truth about what happened. The night my daughter was injured I forgot to strap her in her car seat. When I had my accident she slid right under the cushioned bar on the car seat and fell on the floor. I had only placed her in the car seat and pulled the cushioned bar down. That night I told my wife what really happened and that is why she made the statement she did today. Later when I was questioned about the accident by the police on 11 May 95, I was too ashamed to admit that I might have caused my baby's death by forgetting to strap her in. I had no idea she was as seriously injured as she was after the accident. She really seemed OK. If I knew how bad she was hurt I would have taken her to a hospital immediately, but she really did not have any external injuries and she seemed OK. I really feel terrible about it now.

Prosecution Exhibit 13.

Although there was no physical or independent evidence to prove that there had been a traffic "accident," the above statements formed the basis of the appellant's defense at trial. Japanese police who were investigating the "accident" interviewed the appellant on the day of the accident. During that interview the appellant first claimed that his daughter had been properly secured in her car seat. He then changed his account

of what happened. The appellant's last account to the Japanese police was that the child seat was not properly set into the seat and that his daughter was not protected properly by the belts. He had only put the "shocking bar" down. Record at 538–39.

Just as no one saw the accident that appellant claims produced the victim's fatal injuries, the record contains no direct evidence of the appellant shaking the victim and causing her injuries. The Government's case is entirely circumstantial, relying upon the expert testimony of medical experts and, to a lesser degree, upon the improbability that the victim could have been injured in the manner the appellant described.

Commander Joyce Lapa, Medical Corps, U.S. Navy, testified as an expert witness in forensic pathology. She performed the autopsy on the victim. During the autopsy no significant external injuries were noted. Additionally, the victim did not have a skull fracture, nor did she have any rib fractures or neck injuries, both indicators of shaken baby syndrome. Dr. Lapa testified that the victim had 7 deep bruises on the scalp and 8 impact sites on the top of her head, all of which appeared fresh. The victim also had a deep bruise on her lower back in an area where a child would not normally be bruised. She also found that the victim had an untreated healing fracture of the left femur, which in her opinion was 2–4 weeks old.

Upon opening the victim's skull, Dr. Lapa observed that the victim had suffered a subdural hematoma, bleeding inside the membrane that surrounds the brain. A differential movement between the skull and the brain causes this type injury. It most commonly happens with angular acceleration then deceleration—back-and-forth movement combined with side-to-side movement. This can cause the blood vessels to rupture. The victim also had extensive retinal hemorrhages in both eyes, with the retina being detached in the left eye. Dr. Lapa testified that these injuries, and their severity, are highly correlated with abusive head injury and shaken impact type injuries.

The internal injuries to the victim's head were extensive. Noting these injuries at the time of the autopsy, Dr. Lapa was convinced that her findings were inconsistent with the auto accident. Not only did her medical findings raise doubts concerning the appellant's account, but in addition, the appellant's story had changed several times and he had not immediately sought medical attention for his daughter. Dr. Lapa testified that this behavior was indicative of child abuse. Further, in her opinion, the edema was too severe to have been caused by hitting one's head on the back of the passenger seat.

Even before Dr. Lapa had testified, the Government presented the testimony of Lieutenant Commander Baxter, Medical Corps, U.S. Navy. The military judge recognized him as an expert in the diagnosis of trauma patients involved in auto accidents. Dr. Baxter testified that the victim's injuries were not consistent with a car accident as it had been described, primarily because there were no external injuries. Dr. Baxter would have expected to see a large bruise on the victim's forehead, a laceration, or some external injury. In his opinion the victim's injuries were not consistent with a non-collision auto accident involving a swerve and sudden braking in which the child fell out of the car seat by tipping forward, or by slipping under the restraining bar of the infant seat. He found the victim's injuries inconsistent with flying forward and hitting the padded seat in front of her. Such an event would not have produced the extensive injuries the victim suffered. The shearing injuries to blood vessels in the victim's brain would have required rapid acceleration—deceleration for a period between 5 to 15 seconds.

Dr. Robert Hartmann, an expert in pediatrics and child abuse, concurred in Dr. Lapa's assessment that in child abuse cases the person responsible for producing the injuries to the child will typically tell different stories concerning the injuries and delay in obtaining treatment for the victim. In his view, the history of the case is of the utmost importance in making a determination of what happened. Using Appellate Exhibit L, Dr. Hartmann detailed the inconsistencies in the appellant's explanation of how his daughter responded following the "accident" to how

she could or should have responded given the nature of her injuries.[2]

Dr. Hartmann described the victim's injuries as "massive." They were, in his opinion, much worse than the type you would expect to see in the type of accident described by the appellant. Furthermore, had the victim hit the back of the car seat, he would have expected to see one large area of impact, not eight. He also noted the absence of any injuries to the victim's legs or buttocks, where injuries would be likely if the victim slid under the restraining bar of the car seat. Finally, Dr. Hartmann responded to the appellant's theory that the victim could have hit her head in the accident and then experienced a lucid interval before the life threatening symptoms manifested itself. Dr. Hartmann did not believe the victim had injuries consistent with this, so-called, "talk-and-die" phenomena, because her injuries were too severe. Furthermore, "talk-and-die" is more closely related to a situation involving an epidural hematoma—bleeding from the arteries outside the dural membrane. The victim had subdural hematoma—bleeding from the veins inside the dural membrane.

Dr. Henry Krous, an expert in pediatric pathology was called as a Government witness in rebuttal to the appellant's case-in-chief. He also testified that it is common in child abuse cases for a suspect to change his story. Following his review of the medical evidence, Dr. Krous concluded that this case was one of the "most classic and convincing cases of shaken infant syndrome" that he had seen. Record at 1147. He found that the injuries to the victim's eyes were so severe that had she lived she probably would have been blind. Lieutenant Commander Agrons, Medical Service Corps, U.S. Naval Reserve, an expert in pediatric radiology, confirmed the extent of damage to the victims eyes, testifying that he had never seen a hemor-

rhage as large as the one he saw in the victim's left eye. He also cited a study that reported that in 170 cases of children who had been in traffic accidents and suffered a skull fracture, only 2 had retinal bleeding. On the other hand, 65% of shaken infants have retinal bleeding and diffuse swelling of the brain.

Dr. Agrons also testified that following his examination of the medical evidence he concluded that the victim's injuries were strongly associated with shaken impact syndrome. He also testified that in his opinion it was "implausible" that the injuries were sustained in an auto accident as described by the appellant. Record at 818. Dr. Agrons also testified concerning the injury to the victim's left femur, corroborating Dr. Lapa's autopsy finding noting that the metaphyseal lesion of the left femur was an injury that could be caused by almost nothing other than child abuse.

We need not expound further upon the evidence presented by the Government except to note its consistency.[3] In response, the appellant presented his own expert witnesses. These witnesses included experts in: auto accident investigation and reconstruction; forensic pathology and child abuse pattern injury recognition and interpretation; clinical and anatomical pathology; orthopedic surgery; and neurosurgery and "injury mechanism." He also presented evidence that he was a good and caring parent. We need not recount their testimonies here. We simply find the evidence presented by the Government to be more credible, particularly in light of the numerous studies cited throughout the record.

### Involuntary Manslaughter

The appellant stands convicted of the involuntary manslaughter of his daughter "by means of striking and shaking her." To

---

2. Given the victim's injuries, Dr. Hartmann was quite emphatic that the victim's condition after the injury could not have been as described by the appellant. He testified, "[t]his child should be unconscious or, at the least, should be confused and dazed, glassy eyed, not knowing what's happening at all. I guarantee you, if you had these injuries, you would not be sitting here listening to me. You'd be under the table. These are serious injuries." Record at 731.

3. One Government witness, Dr. Hiromichi Hosoda, an expert in neurosurgery and in the diagnosis and treatment of children who have suffered head trauma in car accidents, testified that the victim's injuries could be consistent with a car accident. Record at 593.

sustain that conviction we must be convinced beyond a reasonable doubt that: the victim is dead; the death resulted from an act or omission of the appellant; the killing was unlawful; and that the appellant's act or omission occurred while assaulting his daughter by striking and shaking her. MANUAL FOR COURTS-MARTIAL, UNITED STATES, (1995 ed.), Part IV, ¶ 44b(2). Several key factors convinced us beyond a reasonable doubt that the evidence of record proved each of these elements. Borrowing from the testimonies of Doctors Chadwick and Krous, those key factors included the subdural bleeding, the severe brain swelling, and the retinal bleeding in the absence of a skull fracture. Even in the tests conducted by the defense accident reconstruction expert, the doll used in the tests had a fabric imprint on its forehead from hitting the back of the passenger seat. The victim, however, had no such marks or bruises.

We also find that the appellant behaved in a manner consistent with one who has been an abusive parent. He told several versions of how his daughter was injured, and the story began to change on the very day of his daughter's fatal injuries. Further, he did not immediately seek medical assistance for her, yet when he picked up his wife she immediately knew something was wrong with her daughter. She noted that the victim was not normal, that her head was leaning to the right, chin towards her chest, eyes closed, and that she was breathing unevenly. Her daughter was hanging and would not straighten up or cry. Record at 453, 456. Her description of her daughter's condition is remarkably similar to what Dr. Hartmann would have expected it to be. *See* note 2, *supra*. We do not ascribe the appellant's wife's powers of observation to maternal instinct, but rather to her merely looking at her daughter. If the appellant was waking up every ten minutes to check on his daughter, as he claimed, he had to have seen the same conditions noted by his wife. Yet he provided no care to his daughter until his wife returned to the car where her daughter sat injured. Finally, having reviewed the video tapes attached to the record and considering the testimony of the witnesses we do not believe that the non-collision "incident"

described by the appellant could have caused the extensive injuries to the victim. Accordingly, we find that the evidence of record is factually sufficient to sustain the appellant's conviction for involuntary manslaughter.

## False Official Statement

■ The appellant also stands convicted of making a false official statement with the intent to deceive. To affirm this conviction we must be convinced beyond a reasonable doubt that: the appellant signed an official statement; the statement was false in certain particulars; the appellant knew that it was false at the time he signed it; and that the appellant made the statement with the intent to deceive. MCM, Part IV, ¶ 31b. In this case the Government alleged that the following language was false: "My daughter was on the floor board in front of the rear seat, half twisted out of her seat and crying. She was still too small for the straps on the car seat. The car seat was resting on top of her. The cushion bar on the car seat was still in the down position. The car seat belt for the left rear seat had somehow disconnected and allowed the car seat to fall forward." Charge Sheet. We find that the evidence of record is factually insufficient to sustain this conviction.

The Government attempts to graft this offense onto the appellant's conviction for involuntary manslaughter, asserting two "obvious" reasons why the appellant's guilt was proven. First, the appellant was convicted of intentionally injuring the victim. Ergo, the appellant's statement cannot be true. Second, the appellant contradicted the charged language in a second statement he provided to the investigators. Ergo, the charged statement cannot be true. Government Answer of 30 Oct 1998 at 13. We find both of these arguments flawed.

The Government has simply failed in its proof that the charged language was false. We will neither join in its attempt to secure the appellant's conviction through what is essentially "spillover," nor through the use of what is essentially an uncorroborated statement. Accordingly, we find that the evidence is factually insufficient to sustain the appellant's conviction for making a false offi-

cial statement. We will provide relief in our decretal paragraph.

### Instructional Error

In his second assignment of error the appellant claims prejudicial error because the military judge did not instruct the members on negligent homicide. As relief, he seeks either a new trial, or in the alternative, he asks us to set aside his conviction of involuntary manslaughter and affirm a conviction of negligent homicide. Appellant raises this issue even though he did not request an instruction on negligent homicide at trial. Appellate Exhibit LXXXVI. Additionally, the appellant did not object to the instructions presented by the military judge concerning the lesser included offenses. Record at 1347, 1423.

The Government counters with two arguments. First, that the appellant forfeited the issue by failing to raise it at trial. Second, that it was unnecessary to instruct on negligent homicide because it was not a lesser included offense in this case. We find the Government's second argument to be case dispositive and we address it first.

■ A military judge has a well-established duty to *sua sponte* instruct on lesser included offenses. *United States v. Jackson*, 12 M.J. 163, 166 (C.M.A.1981); RULE FOR COURTS-MARTIAL 920(e)(2), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1998 ed.). Furthermore, if there are any doubts concerning whether the evidence of record contains some evidence to which the members could attach credit and return a finding on a lesser included offense, those doubts are to be resolved in favor of giving the instruction. *United States v. Rodwell*, 20 M.J. 264, 267 (C.M.A.1985). Nevertheless, the defense can affirmatively waive the instruction. *United States v. Strachan*, 35 M.J. 362, 364 (C.M.A. 1992). Even where the defense does not want the instruction given, however, the military judge can still give the instruction where the evidence raises the issue. *United States v. Emmons*, 31 M.J. 108, 110–11 (C.M.A.1990); *United States v. Frye*, 33 M.J. 1075, 1078 (A.C.M.R.1992). The question here is whether negligent homicide was a lesser included offense of involuntary man-

slaughter in this case. We find that it was not.

■ Article 79, UCMJ, provides that "[a]n accused may be found guilty of an offense necessarily included in the offense charged...." The Manual, Part IV, ¶ 3b(1) provides further clarification of the term "lesser included offense." In general terms it provides that "[a] lesser offense is included in a charged offense when the specification contains allegations which either expressly or by fair implication put the accused on notice to be prepared to defend against it in addition to the offense specifically charged." *Id.* Our superior Court has also provided guidance.

In *United States v. Foster*, 40 M.J. 140 (C.M.A.1994), the Court examined the question as to whether indecent acts were included within indecent assault. In finding that it was a lesser included offense, the Court noted that, " 'lesser-included claims' can only be resolved by lining up elements *realistically* and determining whether *each* element of the supposed 'lesser' offense is *rationally* derivative of one or more elements of the other offense—and *vice versa.*" *Foster*, 40 M.J. at 146 (emphasis in original). Then, in *United States v. Weymouth*, 43 M.J. 329 (1995), the Court of Appeals for the Armed Forces refined the test further by emphasizing the importance of the pleadings in determining whether one offense is included in another:

> Under the pleadings-elements approach, however, the results are the same for the prosecution and the defense. Either the elements alleged in the greater offense (by the statute and the pleadings) fairly include *all* of the elements of the lesser offense or they do not. As alleged, proof of the greater offense must invariably prove the lesser offense; otherwise the lesser offense is not included.

*Weymouth*, 43 M.J. at 335 (emphasis in original).

The appellant recognizes the notice requirement before an offense can be considered a lesser included offense of another. He ignores the requirement, however, that the notice must be contained, either explicitly or by fair implication, in the elements of the offense and the pleadings. *Id.* He argues

that "since the factual history surrounding the auto accident was developed by the appellant well before trial, there is every reason to assume that he was cognizant of the negligent homicide possibility." Appellant's Reply Brief of 16 Feb 1999 at 2–3. The appellant's pretrial strategies, however, do not determine whether one offense is included in another, and he has cited no authority to support that proposition. While the appellant is correct in arguing that the issue is dependent on the evidence presented at trial, even before examining the trial evidence we must examine the elements and the pleadings.

The appellant is also correct in arguing that negligent homicide can be a lesser included offense of involuntary manslaughter. MCM, Part IV, ¶ 44d(2)(b). We have found no case, however, that directly supports the proposition that negligent homicide is a lesser included offense of an involuntary manslaughter prosecuted under the theory that the death occurred while an accused was perpetrating or attempting to perpetrate an assault upon the victim.

In *United States v. McGhee*, 32 M.J. 322 (C.M.A.1991), our superior Court held that negligent homicide was a lesser included offense of involuntary manslaughter. In that case the accused was charged with involuntary manslaughter based upon her culpable negligence in failing to protect her son from the physical abuse of another. In that situation if the accused's degree of negligence was simple, rather than culpable, the elements for negligent homicide would be satisfied. MCM, Part IV, ¶ 85(b)(4). The decision was limited to that factual scenario ("negligent homicide is a lesser offense of involuntary manslaughter *at least under Article 119(b)(1)* "). *McGhee*, 32 M.J. at 325 (emphasis added). The Court also expressed its reservations in finding an aggravated assault to be a lesser included offense of involuntary manslaughter by culpable negligence. *Id.* (citing *United States v. Emmons*, 31 M.J. 108 (C.M.A.1990)).

Here the appellant was charged with the unpremeditated murder of his daughter "by means of striking and shaking her." Although he was acquitted of unpremeditated murder, after the members were properly instructed on the elements of involuntary manslaughter they convicted the appellant of that offense. The instructions the military judge gave the members on this issue required that the members find that the appellant killed his daughter while he was "participating in the commission of the offense of assault consummated by a battery" upon her. Record at 1417. Neither the charged offense nor the offense of which the appellant was convicted included an element of negligence in either the elements of the offenses or in the pleadings, nor did the Government rely upon that theory.[4] Thus, applying the standard outlined in *Weymouth*, and expressing the same reservations as set forth by our superior Court in *McGhee*,[5] we find that under the facts of this case negligent homicide is not a lesser included offense of involuntary manslaughter. Thus, the military judge did not err.[6]

■ We also find that by application of R.C.M. 920(f), the appellant waived this in-

---

4. *See United States v. Bretz*, 19 M.J. 224, 228 (C.M.A.1985)(noting that where Government did not rely upon a theory of aiding and abetting concerning the sale of marijuana the military judge was not required to give that instruction.)

5. We view this situation to be the opposite of that presented in *McGhee*. There the Court expressed reservations that an offense requiring an affirmative act (assault) was a lesser included offense of criminal conduct based on negligence. Here we have a charged offense that required an affirmative act (assault) and a putative lesser-included offense based simply on negligence. We believe that application of the *Weymouth* standard produces the same result, and the desired consistency, in both situations. Indeed, if a military judge

were to instruct on negligent homicide in a similar situation, resulting in a conviction for that offense, we would envision an appeal seeking a reversal of the conviction based upon the *Weymouth* standard.

6. Although not raised as an assignment of error, we also considered the issue of whether an instruction on accident should have been given. We conclude that it was not required because under the defense theory of the case, the appellant's actions in failing to properly secure his daughter in the car seat was a negligent act. Thus the defense of accident did not apply. *See* R.C.M. 916(f), Discussion, and *United States v. Van Syoc*, 36 M.J. 461, 464 (C.M.A.1993).

structural issue. In support of his argument that he did not waive the issue by his failure to object to the instructions, the appellant relies upon *dicta* contained in *United States v. Taylor,* 26 M.J. 127 (C.M.A.1988).[7] The *dicta* he relies on suggests that the waiver provision of R.C.M. 920(f) does not apply to instructions concerning "reasonable doubt, elements of the offenses, and affirmative defenses but instead focuses on those instructions which are mentioned in R.C.M. 920(e)(7)." *Id.* at 128.[8] Appellant's reliance on *Taylor* is misplaced.

In *United States v. Strachan,* 35 M.J. 362 (C.M.A.1992) the accused argued that the military judge should have given an instruction on assault and battery as a lesser included offense of attempted kidnapping even though the accused had withdrawn his request for the instruction. Initially the Court determined that under the facts of the case, assault and battery was a lesser included offense. The Court then turned to the issue of waiver. In deciding the case, the Court recognized its precedent that instructions on lesser included offenses are required unless affirmatively waived, *Strachan,* 35 M.J. at 364, citing *United States v. Moore,* 12 U.S.C.M.A. 696, 31 C.M.R. 282 (1962). The Court then cited the language from R.C.M. 920, that the failure to object waives the issue, absent plain error, and then concluded that "no obvious, substantial error occurred ... because defense counsel knowingly and intelligently waived an instruction on lesser-included offense...." *Id.*

The fact that the appellant's proposed instructions to the military judge did not include a proposed instruction on negligent homicide strengthens the case for waiver in this case, as well as for a finding that there was no plain error. The fact that the appellant failed to identify the need for an instruction on negligent homicide at trial lends credence to the argument that the "error" was neither "clear" nor "obvious."[9] Based upon *Strachan* and R.C.M. 920(f) we hold that the appellant waived the issue in this case by his failure to object. Applying the standards set forth in *United States v. Powell,* 49 M.J. 460 (1998), and *United States v. Riley,* 47 M.J. 276, 279 (1997), we also find that there was no plain error.

Accordingly, we find that the military judge did not err when he did not instruct on negligent homicide. We also find that even if there was error, it was not plain error. Thus, the appellant waived the issue by his failure to object and by failing to include a proposed instruction on negligent homicide along with other proposed instructions he submitted to the military judge.

## Challenge For Cause

In his third assignment of error the appellant argues that the military judge erred when he denied a defense challenge for cause against a court member, Commander Gural, who had previously worked as an emergency medical technician (EMT). CDR Gural revealed that he was a certified EMT and that he "rode in an ambulance for 4 years, before I joined the Navy." Record at 279. CDR Gural agreed that he would not second-guess the testimony of medical personnel, and that if such witnesses testified in a manner contrary to what he remembered in the field of emergency medicine that he would base his judgment on the in-court testimony. *Id.* Finally, he agreed that there was nothing in his background that "would make it hard for him to be impartial about a matter being testified to that touched on medicine." *Id.* at 280.

7. In addition to *Taylor,* the appellant cites *United States v. Gillespie,* 47 M.J. 750, 757 (A.F.Ct.Crim. App.1997), in support of his position that the issue was not waived. We do not find *Gillespie* persuasive to the facts of the appellant's case. In *Gillespie,* the military judge erred in giving the instructions on the actual elements of the offense of which Gillespie was convicted, not a lesser included offense of which he was not. The cases are factually distinguishable.

8. R.C.M. 920(e)(7) provides that instructions on findings shall include: "Such other explanations,

descriptions, or directions as may be necessary and which are properly requested by a party or which the military judge determines, sua sponte, should be given."

9. *See, e.g., United States v. Bullock,* 10 M.J. 674, 676–77 (A.C.M.R.1981)(noting that the "failure of the defense counsel to see an included offense as being raised and thereby failing to request an instruction thereon lends logical support to the conclusion upon later review that the evidence was insufficient to raise it." Nevertheless, the Army Court found error).

Although appellant's counsel questioned CDR Gural, he asked no questions concerning the Commander's background or experience as an EMT. CDR Gural's Court Member Questionnaire, completed on 24 August 1995, indicates that he had been on active duty for 19 years. Appellate Exhibit XIX. Following the conclusion of voir dire the appellant challenged CDR Gural in these terms.

> DC: Sir, going back to Commander Gural, he has approximately 4 years of emergency medical technician training and work experience. We will be having testimony from Japanese EMT's and will be asking them whether they did their jobs right [10] and this will potentially effect their—his prior experience will potentially have fixed opinions.
>
> MJ: A fixed opinion of what?
>
> DC: As to whether the procedures performed by the Japanese ambulance drivers were correct or not.
>
> MJ: This is Japan and he was an EMT in the United States, right? Is there a universal standard that applies or do you know?
>
> DC: Well sir, with regard to saving lives and—
>
> MJ: Is there a universal standard or do you know?
>
> DC: Yes, sir, I believe that CPR and heart functions is a universal standard.
>
> MJ: Go ahead.
>
> DC: In addition to that, he is the neighbor of Major McLain. They live across the street from each other and, although they only see each other in passing, again, it violates the rule that a court-martial should be free from substantial doubt as to partiality.

*Id.* at 325–26.

The Government opposed the challenge for cause against CDR Gural, and the military judge denied it. *Id.* at 328. In exercising his peremptory challenge against CDR Gural, the appellant preserved the issue in accordance with R.C.M. 912(f)(4).

10. We note that no such witnesses were called.

The only possible basis for causal challenge here is R.C.M. 912(f)(1)(N), a general proscription against membership where it would give rise to a "substantial doubt as to the legality, fairness and impartiality" of the proceedings. Since military judges are to liberally grant challenges for cause, their decision denying a challenge is reviewed for a clear abuse of discretion. *United States v. Giles,* 48 M.J. 60, 62 (1998)(citing *United States v. White,* 36 M.J. 284, 287 (1993)). Further, "the burden of establishing that grounds for challenge exists is upon the party making the challenge." R.C.M. 912(f)(3).

We must first determine whether the challenge is based upon actual or implied bias. Actual bias is a credibility issue and great deference is given to the determination of the military judge. *United States v. Daulton,* 45 M.J. 212, 217 (1996). "The test for actual bias is whether any bias 'is such that it will not yield to the evidence presented and the judge's instructions.'" *United States v. Napoleon,* 46 M.J. 279, 283 (1997)(quoting *United States v. Reynolds,* 23 M.J. 292, 294 (C.M.A.1987)). Implied bias, however, is viewed objectively, through the eyes of the public. The focus is on the appearance of fairness. *Id.* Given CDR Gural's responses during *voir dire,* we see no issue of actual bias in this case. We will therefore use an objective standard.

The primary focus of appellant's objection to CDR Gural serving as a member of his court-martial was that CDR Gural had training and experience as an EMT. While this is true, the training and experience occurred before he came in the Navy, and at the time of appellant's trial he had already been on active duty for over 19 years. Time alone attenuated the relevance of that training and experience. Regarding such experience as an EMT, we apply the same logic as did our superior Court in a similar case:

> Supply officers, comptrollers, and financial specialists are routinely selected to sit as court members in cases involving complicated accounting procedures; it would be foolish to ignore such experience. We simply are unwilling to adopt a rule that would require the automatic disqualification of

any person from serving as a court-martial member simply because that individual possesses some degree of expertise in the field related to that which is the substance of the charges against an accused. *United States v. Towers*, 24 M.J. 143, 146 (C.M.A.1987)(denial of challenge for cause where member had been a child welfare counselor in an indecent acts case). *See also United States v. Daulton*, 45 M.J. 212 (1996)(denial of challenge for cause against a doctor who had training in psychiatry and who made child abuse determinations in emergency room situations in a case involving indecent acts with children). Certainly if there was no implied bias in either *Towers* or *Daulton*, there is none in appellant's case based upon CDR Gural's EMT training.

We likewise find no merit in the appellant's concern that CDR Gural lived across the street from one of the trial counsel. "Professional relationships between court members and counsel are not *per se* disqualifying." *Daulton*, 45 M.J. at 217. Similarly, the fact that CDR Gural's father was a police officer is not disqualifying. *See United States v. Dale*, 42 M.J. 384, 386 (1995). We find nothing in the record concerning CDR Gural that disqualified him from serving as a member of appellant's court-martial. Accordingly, we reject the appellant's third assignment of error.

### Conclusion

Accordingly, we affirm only the appellant's conviction of involuntary manslaughter. The conviction for making a false official statement is set aside and dismissed. As a result of our action on the findings, we have reassessed the sentence in accordance with the principles of *United States v. Cook*, 48 M.J. 434 (1998), *United States v. Peoples*, 29 M.J. 426, 428 (C.M.A.1990), and *United States v. Sales*, 22 M.J. 305, 307–08 (C.M.A.1986).

Upon reassessment of the sentence, we approve only so much of the sentence as extends to forfeiture of all pay and allowances, reduction to pay-grade E–1, a dishonorable discharge and confinement for 7 years. A new promulgating order, reflecting the findings and sentence as modified by this decision shall be issued.

Chief Judge SEFTON and Judge TROIDL concur.